**IN THE SUPREME COURT OF PENNSYLVANIA**
**MIDDLE DISTRICT**


**TODD, C.J., DONOHUE, DOUGHERTY, WECHT, MUNDY, BROBSON, JJ.**


| | | |
|---|---|---|
| THOMAS WASHINGTON, | : | No. 13 MAP 2022 |
| | : | |
| Appellant | : | Appeal from the Order of the |
| | : | Commonwealth Court at No. 485 MD |
| | : | 2020 dated December 30, 2021 |
| v. | : | |
| | : | ARGUED:  May 24, 2023 |
| | : | |
| THE PA DEPARTMENT OF | : | |
| CORRECTIONS, | : | |
| | : | |
| Appellee | : | |


*Justice Donohue delivers the Opinion of the Court but for*
*Section III.B.1.b and the final paragraph of footnote 53.*


**<u>OPINION</u>**


**JUSTICE DONOHUE**                                    **DECIDED:  December 19, 2023**

"The heart of the matter is that democracy implies respect for the elementary rights of men, however suspect or unworthy; a democratic government must therefore practice fairness; and fairness can rarely be obtained by secret, one-sided determination of facts decisive of rights." *Joint Anti-Fascist Refugee Comm. v. McGrath*, 341 U.S. 123, 170 (1951) (Frankfurter, J., concurring).  Appellant, Thomas Washington ("Washington"), an inmate at the State Correctional Institution ("SCI") at Houtzdale, has spent the better part of the last two decades on probation or incarcerated for serious criminal offenses.  He works in the prison for a fraction of the minimum wage and occasionally receives gifts from friends and family, both serving to

supplement the meager necessities provided by the institution that controls virtually every other aspect of his life. Those wages and gifts were garnished pursuant to Act 84[1] at a rate of 20% to pay for Washington's court-ordered financial obligations associated with his criminal conviction until 2020 when, without prior notice or an opportunity to be heard, the deduction rate was suddenly increased to 25%.

The government may be entitled to the additional five percent of Washington's property, but that is not the question before us. Today we are concerned with the manner of the taking, because a democratic government must practice fairness to be worthy of its name, and procedural due process must be afforded to both heroes and villains with equal vigor when state action infringes on a fundamental right.[2] Today, this Court reaffirms that principle by holding that Pennsylvania's Department of Corrections ("the DOC" or "the Department") violated Washington's procedural due process rights when it increased the rate of his Act 84 deductions without pre-deprivation notice and an opportunity to be heard. Thus, we reverse the Commonwealth Court's order sustaining the DOC's preliminary objections and remand for further proceedings consistent with this opinion.

---

[1] *See* Act of June 18, 1998, P.L. 640, No. 84, which, as relevant to this appeal, amended 42 Pa.C.S. § 9728 ("Collection of restitution, reparation, fees, costs, fines and penalties").

[2] "The very essence of civil liberty certainly consists in the right of every individual to claim the protection of the laws, whenever he receives an injury. One of the first duties of government is to afford that protection." *Marbury v. Madison*, 5 U.S. 137, 163 (1803).

## I. Background

In 2015, Washington entered a nolo contendere plea to charges of aggravated assault and person not to possess a firearm,[3] after which the trial court immediately sentenced him to five to ten years of incarceration pursuant to a plea agreement. The court ordered Washington to pay the costs associated with his prosecution, N.T., 3/9/2015, at 19, and restitution totaling $15,666.49, Restitution Order, 4/8/2015, at 1.[4] Since that time, Washington has been serving his sentence at SCI Houtzdale.

Until January of 2020, deposits to Washington's prisoner account at SCI Houtzdale were docked by the DOC at a rate of 20% pursuant to Act 84, but he later discovered that the Act 84 deduction rate increased to 25%. When he discovered the increase had been applied, Washington filed an official grievance form with the DOC. CD-804 Grievance Form, 8/2/2020, at 1. Therein, he asserted that he was never notified by the DOC of the increase, and he requested that any additional deductions "cease until a proper hearing is afforded." *Id.* On August 5, 2020, Washington's grievance was rejected.[5]

---

[3] 18 Pa.C.S. §§ 2702, 6105, respectively. Briefly, the facts supporting Washington's nolo contendere plea to these offenses establish that Washington engaged in a high-speed vehicle chase, which ended when he rammed his car into a police vehicle. N.T., 3/9/2015, at 11. During the on-foot pursuit that followed, Washington dropped a loaded firearm shortly before he was ultimately arrested by police. *Id.* at 11-12.

[4] Although Washington still owed a substantial portion of the restitution when the instant litigation began, the trial court's docket indicates that the court subsequently vacated the restitution order on June 30, 2022. Nevertheless, Washington remains obligated to pay the various costs and fees associated with the prosecution in that case, which initially totaled $1,385.55.

[5] The grievance officer believed that Washington's complaint was untimely, explaining in the rejection form that the rate change occurred on January 15, 2020. Grievance Rejection Form, 8/5/2020, at 1. The rejection form indicated that several previous deductions to Washington's account at the 25% rate had occurred between January (continued…)

On August 25, 2020, Washington timely filed a petition for review in the Commonwealth Court alleging that he was denied his procedural due process rights under the Fourteenth Amendment when the DOC deducted Act 84 payments from his prison-account deposits at the 25% rate absent notice and without holding a pre-deprivation hearing. Pet. for Review, 8/25/2020, ¶¶ 4-5, 10. Washington asserted that he was entitled to relief in the form of a post-deprivation hearing and requested injunctive relief—the cessation of the additional deductions—until that hearing was provided. *Id.* ¶ 10.[6] The DOC filed preliminary objections in the nature of a demurrer, maintaining that the deductions were authorized under Act 84 and that any procedural due process concerns had been satisfied at the sentencing hearing. Prelim. Obj., 9/21/2020, ¶¶ 7-10. Furthermore, the DOC argued that the newly-amended version of Act 84 mandated a minimum deduction of 25%. *Id.*, ¶¶ 14-15. Because Washington

---

(…continued)

and August of 2020, and stated that the DOC's policy required grievances to be raised within fifteen working days of the complained-of occurrence. *Id.* Thus, Washington's grievance was ostensibly deemed untimely by the DOC because at least one of those 25% deductions had occurred more than fifteen working days prior to August 2, 2020. The rejection form did not specifically identify which prior deduction had triggered the fifteen-day time limitation on Washington's grievance. The Commonwealth Court did not assert the untimeliness of his grievance as basis for granting the DOC's preliminary objections, finding that a two-year statute of limitations applied. No party challenges that determination in this appeal.

[6] Washington also raised other legal theories supporting his right to relief, most of which are not relevant to the current issues before this Court. However, we note that Washington also requested a hearing pursuant to Pa.R.Crim.P. 706, *id.* ¶ 9, which provides that in "cases in which the court has ordered payment of a fine or costs in installments, the defendant may request a rehearing on the payment schedule … when the defendant advises the court that such default is imminent." Pa.R.Crim.P. 706(D). "At such hearing, the burden shall be on the defendant to prove that his or her financial condition has deteriorated to the extent that the defendant is without the means to meet the payment schedule." *Id.* If a defendant meets that burden, the court is empowered to "extend … the payment schedule …as the court finds to be just and practicable under the circumstances of record." *Id.*

did "not dispute that he was sentenced to pay . . . financial obligations associated with his sentence, and the [DOC] has authority under Act 84 to deduct those costs," the DOC argued for dismissal of Washington's petition for failure to state a claim. *Id.* ¶ 18.

In a non-precedential memorandum opinion filed on December 30, 2021, a divided panel of the Commonwealth Court "sustained the demurrer[,]" reasoning that because the DOC "lacks discretion to alter the amount of deductions" under the newly amended version of Act 84, Washington failed to "state a constitutional claim[.]" *Washington v. PA Dep't of Corr.*, No. 485 M.D. 2020, 2021 WL 6139806 at *1 (Pa. Commw. Dec. 30, 2021) (non-precedential decision).

In reaching that conclusion, the court first considered its standard of review for preliminary objections in the nature of demurrer[7] and the leniency it affords to pro se litigants, before turning to consider Act 84's pre-amendment history. The lower court acknowledged that in *Bundy v. Wetzel*, 184 A.3d 551, 556 (Pa. 2018), this Court established that the DOC is subject to certain due process requirements when making Act 84 deductions from prisoner accounts. *Washington*, 2021 WL 6139806 at *2. Namely, applying the rationale of the Third Circuit in *Montañez v. Secretary Pennsylvania Department of Corrections*, 773 F.3d 472 (3d Cir. 2014), we held in *Bundy* that to satisfy the Due Process Clause in connection with Act 84 deductions, the DOC must,

---

[7] A demurrer challenges the legal sufficiency of a complaint. *Ins. Adjustment Bureau, Inc. v. Allstate Ins. Co.*, 905 A.2d 462, 468 (Pa. 2006). That is, assuming the truth of the as-pled facts and any reasonable inferences derived therefrom, a demurrer tests whether the law permits recovery under the assumed facts. *Id.* If the law does not permit recovery, there is no need for a trial to test the credibility of the factual averments, and the demurrer should be granted. *Id.* However, where the availability of a remedy under the law is in doubt, a motion in the nature of demurrer should be denied. *Id.*

prior to the first deduction: (a) inform the inmate of the total amount of his financial liability as reflected in his sentencing order, as well as the Department's policy concerning the rate at which funds will be deducted from his account and which funds are subject to deduction; and (b) give the inmate a reasonable opportunity to object to the application of the Department's policy to his account.

*Bundy*, 184 A.3d at 558–59.

The Commonwealth Court next considered our subsequent decision in *Johnson v. Wetzel*, 238 A.3d 1172 (Pa. 2020), which largely reaffirmed our holding *Bundy*. *Washington*, 2021 WL 6139806 at *3. From our decision in *Johnson*, the Commonwealth Court ascertained that

> [t]o the extent the circumstances do not allow a pre-deprivation process, "a meaningful post-deprivation remedy satisfies due process." *Johnson*, 238 A.3d at 1182 (quoting *Bundy*[], 184 A.3d at 557). As such, due process requires that the DOC, in response to an administrative grievance which accurately recites that no *Bundy* process was afforded prior to the first Act 84 deduction, must give the grievant notice of the items required by *Bundy* and a reasonable opportunity to explain why the past and/or intended deductions should not take place notwithstanding the dictates of Act 84.

*Id.*

The Commonwealth Court acknowledged that it was undisputed in this case that the DOC "did not provide notice of the increased deduction." *Id.* Nevertheless, the court distinguished Washington's due process claim from those raised in *Bundy* and *Johnson* because, prior to its recent amendment, "Act 84 did not specify a percentage for deduction," and instead "authoriz[ed the] DOC to make deductions and allow[ed the] DOC to establish the amount." *Id.* The DOC's prior policy set a maximum deduction rate of 20%, with the caveat that the DOC would only make Act 84 deductions from inmate accounts with balances exceeding $10.00. *Id.* However, the newly-amended version of Act 84 requires a minimum deduction of 25%.

The lower court then cited, but only briefly discussed, its prior decision in *Beavers v. Pennsylvania Department of Corrections*, No. 486 M.D. 2020, 2021 WL 5832128 (Pa. Commw. filed Dec. 9, 2021). That decision was issued by the same three judges who decided this case, and by the same two-to-one split,[8] approximately three weeks earlier. *Beavers* also involved an inmate's procedural due process challenge to the DOC's implementation of the 2019 amendment to Act 84.[9] The *Beavers* court explained that when Act 84 was originally enacted, the legislature had "committed the rate of the deduction to the discretion of the Department[,]" but the 2019 amendment "set a minimum deduction rate of 25%." *Id.* at *3. Beavers claimed that the DOC "should have provided him" with notice and a hearing "prior to raising the deduction rate from 20% to 25%." *Id.* at *4.

The *Beavers* court disagreed, first, because Beavers was "presumed to know the laws of this Commonwealth" and therefore had been adequately notified of the 25% rate by the 2019 amendment itself. *Id.* Second, the court reasoned that the DOC satisfied its obligations under *Bundy* because Beavers already had an Act 84 hearing before the rate change. *Id.* To the extent that *Bundy* requires notice of the rate of deduction, the Commonwealth Court determined that "the deduction rate will be an item in a *Bundy*

---

[8] *Beavers* was authored by President Judge Emerita Mary Hannah Leavitt and joined by Judge Andrew Crompton. Judge Patricia A. McCullough dissented. *Washington* was authored by Judge Crompton and joined by President Judge Emerita Leavitt. Judge McCullough dissented, relying on her dissenting opinion in *Beavers*.

[9] In nearly identical circumstances to the instant case, Beavers asked the Commonwealth Court "to terminate the 5% increase in deductions until the Department affords him "a proper hearing[,]" and he also requested the return of "the amounts deducted from his account in excess of 20%." *Beavers*, 2021 WL 5832128, at *1.

hearing" after the 2019 amendment "only where the Department exercises discretion to impose a deduction rate higher than 25%." *Id.* at *4 n.5.[10]

Third, the *Beavers* court addressed the other *Bundy*/*Montanez* notice requirements, stating that the increase from 20% to 25% "did not change the total amount of Beavers' court-ordered fines and costs or change the account from which the deductions are made." *Id.* Fourth, the court found that because the legislature mandated the 25% minimum rate that was applied to Beavers, the DOC "could not order a lesser deduction percentage even if it gave Beavers the hearing he seeks." *Id.* Finally, the court determined that Beavers was not entitled to relief because "the purpose of the pre-deduction hearing is to prevent erroneous deductions" and *Beavers* did not allege "that there were any errors that a hearing might correct." *Id.* Beavers did not appeal from that decision.

In this case, the Commonwealth Court cited its prior decision *Beavers*, noting that, facing similar claims, the *Beavers* court "reasoned that the increased deduction set forth in the statute did not warrant additional notice or an opportunity to object." *Washington*, 2021 WL 6139806, at *4. It then stated, "[c]ritically, as recognized in *Beavers*, the statutory language materially differs from that in effect when *Bundy* and *Johnson* were decided" such that the "current statute does not afford DOC discretion over setting the amount and effectuating the deduction" and, consequently, the "DOC does not have the authority to exercise its discretion reasonably to discern whether the amount it deducts requires additional due process through an administrative process."

---

[10] The Commonwealth Court determined that this is because "the rate of the deduction was set by the legislature," and as such "the concerns recognized by the Third Circuit in *Montañez* and our Supreme Court in *Bundy* . . . and its progeny are not present. Further, the notice prescribed in *Bundy* does not include notice of a change in Act 84." *Beavers*, 2021 WL 5832128, at *4.

*Id.* (footnote omitted). Because the "statutory language materially differs from that in effect when *Bundy* and *Johnson* were decided[,]" in that the "current statute does not afford DOC discretion over setting the amount and effectuating the deduction[,]" the Commonwealth Court determined that the DOC had "no duty" to provide notice of the rate change. *Id.* at *4.

Judge McCullough dissented, citing the rationale she previously provided in her dissent in *Beavers*. In *Beavers*, Judge McCullough would have determined that the DOC's implementation of the rate change precipitated by the amendment to Act 84 "runs afoul of *Bundy*." *Beavers*, 2021 WL 5832128 at *7 (McCullough, J. dissenting). Judge McCullough stated that

> [o]ur Supreme Court has made it unmistakably clear that due process requires the provision of notice to the inmate, prior to the first deduction, of "the rate at which funds will be deducted from his account." *Johnson*, 238 A.3d at 1182; *Bundy*, 184 A.3d at 558. Even if one does not consider an increase in the rate to constitute a new "first" deduction for purposes of *Bundy*—which would be a reasonable conclusion—the ability to increase the rate of deduction without providing notice to the inmate would render this repeatedly stressed requirement absolutely meaningless.

*Id.*

Judge McCullough also sparred with aspects of the *Beavers* majority's reasoning. First, she rejected the notion that Beavers had been adequately notified by the publication of the amendment to Act 84, contending "that rationale flips the due process burden on its head. It is the [DOC]'s obligation to provide notice of a property deprivation; it is not an inmate's burden to invite the [DOC] to meet its *Bundy* obligations." *Id.* Second, Judge McCullough would have found that Beavers' pre-amendment sentencing hearing was inadequate for purposes of permitting him to challenge a post-rate change deduction under Act 84. *Id.* at *8. Third, Judge

McCullough also rejected the *Beavers* majority's attempt to distinguish the at-issue rate change with this Court's decisions in *Bundy* and *Johnson*, stating that discretion in imposing the deduction rate was immaterial because due process is triggered by the deprivation of a property interest itself, not by the particular legal authority for the deprivation, be it by "a statute, a regulation, a policy, or an ad hoc decision-making process[.]" *Id.* Further, regarding the new mandate under Act 84, Judge McCullough pointed out that the amendment had already been in place when this Court decided *Johnson*, wherein this Court

> nonetheless mandated that inmates be provided with notice and an opportunity to object to the deductions—either pre-deprivation or post-deprivation—so that they could "explain why the past and/or intended deductions should not take place **notwithstanding the dictates of Act 84**." *Johnson*, 238 A.3d at 1183 (emphasis added). Although the Department may not alter the statutory amount of 25%, its constitutional obligation to provide inmates with notice has not been eliminated or otherwise modified, and it still may make errors subject to correction. The due process mandated by *Bundy* and *Johnson* may allow for the development of a "meritorious challenge along these lines," which "would then implicate the substantive remedy of restoring the prisoner's wrongly-deducted funds to his or her account." *Id.*

*Id.* As to Beavers' failure to assert any error in the deduction made from his account, Judge McCullough stated that "this sidesteps the injury asserted" because the issue before the Commonwealth Court was "the deprivation of due process, the provision of which would allow for the potential development of an argument regarding such errors[,]" the adjudication of which could occur after adequate process is provided. *Id.*

Judge McCullough concluded by suggesting that when the General Assembly enacted the amendment to Act 84 in 2019, it was "fully aware of the due process implications" of *Bundy*, which had been decided only a year earlier. *Id.* at *9 (citing 1

Pa.C.S. § 1922(4) (presuming that "when a court of last resort has construed the language used in a statute, the General Assembly in subsequent statutes on the same subject matter intends the same construction to be placed upon such language")). Consequently, Judge McCullough would have determined that the "only consequence of that statutory amendment which should fall upon inmates is the mandated increase in deductions from their accounts after they receive all of the process due under *Bundy*— the consequence should not be that inmates' due process rights are swept away entirely." *Id.*

Washington timely filed a notice of appeal,[11] and now raises the following questions for our review:

> 1. Whether the Commonwealth Court erred in holding that the [DOC's] increase in the rate of deduction from inmate accounts to pay court ordered costs and restitution pursuant to 42 Pa.C.S. § 9728(b)(5)(i) could be applied to Mr. Washington without notice or an opportunity to be heard?
>
> 2. Whether the Commonwealth Court erred in holding that the [DOC] lacks discretion to alter the amount of the deduction under 42 Pa.C.S. § 9728(b)(5), notwithstanding that the deprivation of property triggers principles of due process?

Washington's Brief at 5.[12]

---

[11] This Court has "exclusive jurisdiction" over "appeals from final orders of the Commonwealth Court entered in any matter which was originally commenced in the Commonwealth Court except an order entered in a matter which constitutes an appeal to the Commonwealth Court from another court, a magisterial district judge or another government unit." 42 Pa.C.S. § 723(a). Such appeals are considered as of right. Pa.R.A.P. 1101.

[12] For the reasons set forth below in our analysis, we address the second question as subsidiary to the first.

## II. Parties' Arguments

### A. Washington's Argument

Washington maintains that to comply with due process, state actors "must provide certain procedural safeguards . . . by which an individual can raise objections to a deprivation of their constitutionally-protected property interests." Washington's Brief at 12. He acknowledges that the degree of process that must be afforded is informed by "a balancing of the interests at stake in a particular context[.]" *Id.* Nevertheless, Washington argues that "the right to notice and a meaningful opportunity to be heard" constitute the minimum due process requirements in all circumstances where the state acts to deprive an individual of life, liberty, or property. *Id.* (quoting *LaChance v. Erickson*, 522 U.S. 262, 266 (1998) ("The core of due process is the right to notice and a meaningful opportunity to be heard.")). He states that these principles indisputably apply here because, at least since *Buck v. Beard*, 879 A.2d 157, 160 (Pa. 2005), this Court has consistently held that incarcerated individuals hold a "constitutionally protected interest in the funds in their inmate accounts" such that due process is implicated when the DOC extracts funds from those accounts. *Id.*

Washington traces the subsequent development of due process jurisprudence with respect to monies deducted from prisoner accounts under the authority of Act 84. In *Montañez,* the Third Circuit held that inmates are entitled to pre-deprivation process when the DOC appropriates funds from inmate accounts pursuant to Act 84. *Id.* at 13 (citing *Montañez*, 733 F.3d at 483). Elaborating, the *Montañez* court also identified particular "categories of information to which due process must apply[.]" *Id.* at 14. The *Montañez* court specified that, before the first deduction, notice must be provided to inmates of 1) the inmate total debt, 2) the rate at which funds will be deducted to satisfy that debt, and 3) which funds are subject to garnishment. *Id.* (citing *Montañez*, 733 F.3d

at 486) (hereinafter "*Montañez*'s notice requirements"). In addition, the Third Circuit determined that inmates must be afforded a "meaningful opportunity to object to the application of" the DOC's Act 84 policy before the first deduction is taken. *Id.* (quoting *Montañez*, 733 F.3d at 486).

Washington observes that this Court "embraced" the *Montañez* decision in *Bundy*, and that we further expressed a preference for pre-deprivation process in service of error avoidance. *Id.* However, he highlights our caveat that "where pre-deprivation notice and hearing 'is not feasible, . . . the availability of a meaningful post-deprivation remedy satisfies due process.'" *Id.* (quoting *Bundy*, 184 A.3d at 557). Washington also points out that in *Bundy* we reiterated that to comply with due process, notice in the context of Act 84 must include *Montañez*'s notice requirements. *Id.* at 14-15.

Washington next recounts that, soon after *Bundy*, this Court revisited Act 84 in *Johnson* and reaffirmed that due process principles require "notice of certain items and a reasonable opportunity to object before the first Act 84 deduction is made." *Id.* at 15, (quoting *Johnson*, 238 A.3d at 1182). He asserts the *Johnson* Court "squarely held that post-deprivation process must be given 'to inmates whose accounts were subject to Act 84 deductions without the benefit of pre-deprivation safeguards.'" *Id.* 15-16 (quoting *Johnson*, 238 A.3d at 1182-83).

Synthesizing these cases, Washington avers the

> due process mandates that follow from these decisions are plain enough. Where an incarcerated person shows "that no *Bundy* process was afforded prior to the first Act 84 deduction," the DOC "must give the grievant notice of the items required by *Bundy* and a reasonable opportunity to explain why the past and/or intended deductions should not take place notwithstanding the dictates of Act 84." [*Johnson*, 238 A.3d] at 1183. And if the incarcerated person's challenge is "meritorious," he or she is entitled to "the

> substantive remedy of restoring the prisoner's wrongly-deducted funds to his or her account." *Id.* So it should be for Mr. Washington as well.

*Id.* at 16.

Given the above legal framework, Washington contends that, in this case, 1) it is undisputed that he has a constitutionally-protected property interest in the money in his inmate account; 2) as such, he was entitled to *Montañez*'s notice requirements as established in *Bundy*, including notice of the rate at which funds will be deducted from his account pursuant to Act 84; and, thus, 3) he was entitled to an opportunity to explain why deductions at the new 25% rate should not occur "notwithstanding the dictates of Act 84." *Id.* at 16-17 (quoting *Johnson*, 238 A.3d at 1183). Because no such pre-deprivation was provided, Washington argues that "due process principles mandated a post-deprivation opportunity to object to the rate increase." *Id.* at 17. Consequently, he maintains that the Commonwealth Court erred in concluding otherwise. *Id.*

Washington also insists that the Commonwealth Court's rationale is unsustainable. He rejects the notion that the mandatory nature of the amended version of Act 84 renders *Bundy* and *Johnson* inapplicable under the facts of this case, arguing instead that due process "is owed when the Constitution commands it." *Id.* at 19. Thus, according to Washington, notice and an opportunity to be heard are mandated regardless of whether the legislature crafts a mandatory or discretionary garnishment scheme under Act 84. He argues that failure to provide notice is itself a constitutional violation that requires a remedy, and that, even though a pre-deprivation hearing was not provided, the Commonwealth Court should have ordered a post-deprivation hearing to remedy the procedural due process violation that occurred.

As to the Commonwealth Court's belief that Washington "would have no actionable challenge in a hearing based on the 25% rate being" mandatory, he argues

that the court "veered off course" because this Court held in *Johnson* that due process requires a reasonable opportunity to explain why the Act 84 deduction should not occur "**notwithstanding the dictates of Act 84.**" *Id.* at 20 (quoting *Johnson*, 238 A.3d at 1183) (emphasis by Washington). For instance, Washington maintains that due process "guarantees a right to explain why past or future deductions at the 25% rate should not be imposed because of the hardships it would occasion." *Id.* at 21.

Washington contends that when hardships can be demonstrated, "a court has the power to provide relief from the deprivation in line with constitutional commands, citing this Court's statement in *League of Women Voters v. Commonwealth*, 178 A.3d 737, 822 (Pa. 2018), that "our Court possesses broad authority to craft meaningful remedies when required." *Id.* He endorses Judge McCullough's suggestion that a meritorious challenge could lead to the restoration of the seized funds to Washington's account. *Id.* (citing *Beavers*, 2021 WL 5832128 at *8 (McCullough, J., dissenting)). Courts do not merely have the power to craft appropriate remedies for due process violations, Washington suggests, but the obligation to do so. *Id.* (citing *Robinson Twp. v. Commonwealth*, 83 A.3d 901, 969 (Pa. 2013) (stating "this Court has an obligation to vindicate the rights of its citizens where the circumstances require it and in accordance with the plain language of the Constitution").[13] Furthermore, Washington contends that the 2019 amendment to Act 84 cannot be read to be a legislative attempt to deprive prisoners of their due process rights, as *Bundy* was issued before the amendment, and

---

[13] As to the notion that a remedy might not always be available for some due process violations, Washington invokes the ancient principle *ubi jus, ibi remedium* (where there is a right, there is a remedy), which this Court recently cited in *Commonwealth v. Koehler*, 229 A.3d 915, 933 (Pa. 2020). Washington's Brief at 21. In *Koehler*, we stated: "To strip the Due Process Clause of all remedies to address that clause's violation is to eliminate the underlying right itself[,]" *Koehler*, 229 A.3d at 933, and, the "right to a remedy is, itself, a right protected by due process." *Id.* n.10.

the "'General Assembly is presumed to know the state of the law as set forth in the decisions of this Court.'" *Id.* at 22 (quoting *Commonwealth v. McClintic*, 909 A.2d 1241, 1252 (Pa. 2006)).

Additionally, Washington argues that the text of the amendment "reinforces" the legislature's "acceptance of *Bundy*." *Id.* He contends that by permitting the DOC to "develop guidelines relating to its responsibilities" under Act 84, the legislature granted the DOC discretion to deviate from the 25% mandate because the DOC bears the responsibility to comply with *Bundy*'s due process requirements. *Id.* (quoting 42 Pa.C.S. § 9728(b)(5)(iv)). Washington observes the following:

> By the same token, nowhere in this statutory scheme is there any clear statement by the legislature evidencing an attempt to infringe on what *Bundy* commands, nor is there any basis to presume the legislature intended to displace what *Bundy* plainly requires. *See In re Trust Under Deed of David P. Kulig, Dated January 12, 2001*, 175 A.3d 222, 238 (Pa. 2017) (explaining that, as a matter of "judicial reluctance," this Court will not "find legislative intent to effectuate a substantial change to time-honored legal principles" unless such a change is "is expressed clearly and unmistakably or, at least, follows by necessary implication from the statutory text," a "stringent standard."); *Carrozza v. Greenbaum*, 916 A.2d 553, 566 (Pa. 2007) ("[S]tatutes are not presumed to make changes in the rules and principles of the common law or prior existing law beyond what is expressly declared in their provisions." (quoting *Commonwealth v. Miller*, 364 A.2d 886, 887 (Pa. 1976)).

*Id.* at 23. Washington further notes that when this Court decided *Johnson*, the 2019 amendment to Act 84 was already in effect.[14] Moreover, even if the amended version Act 84 can be read to conflict with the due process requirements articulated in

---

[14] Although the 2019 Amendment to Act 84 was in effect when this Court issued *Johnson* in October of 2020, we did not mention the amendment or otherwise discuss its text.

*Montañez*, *Bundy*, and *Johnson*, Washington suggests that the legislature "cannot legislate away [his] right to be heard on the rate increase[,] and the Commonwealth Court's displacement of due process mandates based on a legislative declaration cannot be sustained." *Id.* at 27.[15]

Washington also contests the lower court's assumption that a post-deprivation hearing would be fruitless, stating that the "fruitlessness point does not provide a post hoc rationale for failing to provide a hearing in the first instance" because the "'right to be heard does not depend upon an advance showing that one will surely prevail at the hearing.'" *Id.* at 24 (quoting *Fuentes v. Shevin*, 407 U.S. 67, 87 (1972)). Washington contends that it is wholly unremarkable that many claims by incarcerated individuals will ultimately prove to be meritless, arguing that due process in this context guarantees the opportunity to seek a remedy, not the remedy itself.[16] He points out that *Montañez* did not require the DOC "to implement a deduction policy that permitted 'exceptions to its across-the board 20% rate of deduction.'" *Id.* at 25 (quoting *Montañez*, 773 F.3d at 486). Instead, "despite having already adjudicated the reasonableness of the 20% rate," *Montañez* did not hold that "incarcerated people no longer needed their due process rights. Rather, *Montañez* still required the DOC to 'provide an opportunity for

---

[15] In this regard, Washington cites our decision in *Mesivtah Eitz Chaim of Bobov, Inc. v. Pike County Board of Assessment Appeals*, 44 A.3d 3 (Pa. 2012), where, when considering whether the General Assembly could "influence the definition" of a constitutionally-defined phrase, we stated that the "General Assembly" cannot "alter the Constitution by purporting to define its terms in a manner inconsistent with judicial construction; interpretation of the Constitution is the province of the courts." *Mesivtah*, 44 A.3d at 7 (quoting *Pottstown Sch. Dist. v. Hill Sch.*, 786 A.2d 312, 319 (Pa. Commw. 2001) (en banc)).

[16] Washington cites Justice Wecht's concurring and dissenting opinion in *Johnson*, joined by this Author, indicating that "[n]o matter what the underlying merits of a claim may be, our courts must be open to all those who come before them, seeking to invoke their jurisdiction." *Johnson*, 238 A.3d at 1197 (Wecht, J., concurring and dissenting).

inmates to object to potential errors in the deduction process' and unquestionably enumerated 'the rate at which funds will be deducted' as an item to which due process applied." *Id.* Likewise, here, Washington contends that prejudging the merits of his challenge misapprehends that his injury is not the deprivation of property itself, but the fact that the deprivation occurred without due process of law.[17] In any event, Washington observes that in *Bundy* this Court explained that "nominal damages may be warranted" if "a procedural due process violation is demonstrated." *Id.* at 26 (quoting *Bundy*, 184 A.3d at 559); *see also Carey v. Piphus*, 435 U.S. 247, 266 (1978) ("Because the right to procedural due process is 'absolute' in the sense that it does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, . . . we believe that the denial of procedural due process should be actionable for nominal damages without proof of actual injury.") (citation omitted).

Finally, Washington addresses the Commonwealth Court's reliance on *Beavers*. As to the notion that notice was provided by the enactment of the amendment to Act 84 itself, he agrees with Judge McCullough's dissent that such reasoning "flips the due process burden on its head[.]"[18] We implicitly rejected a similar rationale in *Johnson* by failing to invoke the ignorance-of-the-law-is-no-excuse maxim to address Johnson's due

---

[17] *See Daniels v. Williams*, 474 U.S. 327, 339 (1986) (Stevens, J., concurring) ("In a procedural due process claim, it is not the deprivation of property or liberty that is unconstitutional; it is the deprivation of property or liberty without due process of law - without adequate procedures.").

[18] *Beavers*, 2021 WL 5832128 at *7 (McCullough, J., dissenting).

process claim despite acknowledging that maxim when analyzing Johnson's negligence claim. Washington's Brief at 27-28.[19]

*Beavers* also held that due process was satisfied because inability-to-pay concerns were addressed at Beavers' sentencing. *Beavers*, 2021 WL 5832128 at *5. Washington maintains that proposition is "not universally true" because not "all incarcerated people are entitled to consideration of their financial conditions at sentencing[.]" Washington's Brief at 28. He notes that "42 Pa.C.S. § 9726(c) exists only in the context of non-mandatory fines." *Id.* (citing *Commonwealth v. May*, 271 A.3d 475, 482 (Pa. Super. 2022) ("It is well-established that § 9726(c) does not apply to mandatory fines.")).[20] Here, however, Washington avers that he was only ordered to pay costs and restitution, neither of which entitled him to an ability-to-pay assessment under Section 9726(c) and that the sentencing transcript does not reflect any consideration of his ability to pay in any event. *Id.* at 29. Washington also questions *Beavers'* conclusion that no hearing is necessary where the inmate has already been informed of the total amount owed, as *Montañez*'s notice requirements include the rate at which funds will be deducted, which he contends includes notice of rate changes as occurred in this case. Thus, he argues that a post-deprivation hearing will not be redundant.

---

[19] *See Johnson*, 238 A.3d at 1182 n.9 (recognizing that "inmates are not assumed to be ignorant of the law").

[20] 42 Pa.C.S. § 9726(c) provides that a court "shall not sentence a defendant to pay a fine" unless 1) "the defendant is or will be able to pay the fine;" and 2) "the fine will not prevent the defendant from making restitution[.]"

B. DOC's Argument[21]

The DOC recognizes "that prior to making the first deduction from an inmate wage or personal account pursuant to Act 84, the taking of inmate monies implicates the Due Process Clause and the inmate must be afforded notice and an opportunity to be heard." DOC's Brief at 7. The Department asserts that, prior to the 2019 amendment to Act 84, it complied with these requirements under its Act 84 deduction policy by transmitting notice to the inmate of his or her Act 84 obligations and by affording a process for addressing grievances.[22] The DOC maintains that Washington

---

[21] The DOC invites this Court to take judicial notice of its current Act 84 deduction policy, DC-ADM 005 (effective January 15, 2020) ("Current DOC Policy"). DOC's Brief at 7 n.1. The policy is publicly available to view at the following website: https://www.cor.pa.gov/About%20Us/Pages/DOC-Policies.aspx. As Washington has not objected, and because it will aid our review, we take judicial notice of the Current DOC Policy. Moreover, the Current DOC Policy was considered by the Commonwealth Court in *Beavers*.

[22] The notice form found within the Current DOC Policy conforms to *Montañez*'s notice requirements, as *Bundy* required. Current DOC Policy, Attachment 3-A. It identifies the inmate's total debt obligation broken down into specific amounts owed for fines, costs, restitution, and Crime Victim Compensation Fund fees. *Id.* It also states which funds are subject to deductions, and the rate(s) at which incoming funds will be garnished. *Id.* Additionally, the notice describes the grievance process and potential grounds for filing a grievance, including, inter alia, a claim that the obligations are not owed "for any other reason." *Id.* Notably, the notice informs inmates that "Under DC-ADM 005, **provided that you have at least $10 in your inmate account**, your inmate account will be subject to an initial deduction to pay the entire amount of your Crime Victim Compensation/Victim Services Fund fees, and an additional 25% of the remaining funds in your account may also be deducted." *Id.* (emphasis added). Inmates are then advised that, subsequently, "all incoming funds (except those specifically noted in the DC-ADM 005) will be subject to a deduction, **provided that you have at least $10 in your inmate account**." *Id.* (emphasis added). The DOC's policy governing the ten-dollar exception is described in numerous sections of DC-ADM 005. Current DOC Policy §§ 2(B)(4)(a), 3(A)(2)(e)(1), 3(A)(2)(e)(2), 3(C)(2)(b)(1), 3(F)(1-6). Although the Commonwealth Court referenced and quoted from the prior DOC policy in its decision—specifically mentioning the ten-dollar exception—it did not consider the DOC's continued application of that exception in reaching its decision. *See Washington*, 2021 (continued…)

"does not dispute that he received the proper notice and opportunity to be heard prior to the first Act 84 deduction from his inmate account." *Id.* at 7.

Prior to the 2019 amendment, the DOC had discretion under Act 84 to determine the deduction rate, which it set at 20%. *Id.* at 7-8. According to the Department, the "most significant legislative change affecting Act 84" was that the DOC is now "**required to** make monetary deductions of **at least 25%** from an inmate's wage or personal account to satisfy costs, restitution and other fees." *Id.* at 9 (citing 42 Pa.C.S. § 9728(b)(5)) (emphasis by DOC). Reasoning that "Act 84 is procedural in nature and may be applied retroactively, the [DOC] increased [Washington]'s deductions from 20% to 25%." *Id.* The DOC does not allege that it notified Washington of the rate change.

Nevertheless, the DOC maintains it afforded Washington "pre-deprivation due process to ensure there were no errors in the application of the Department's policy to his inmate wage and personal accounts; specifically, the total amount of money [Washington] owed to the Commonwealth and which accounts the monetary deductions would be made from." *Id.* at 11. However, the DOC recognizes that the issue here is whether Washington was entitled to additional notice and an opportunity to be heard "once the rate changed from 20% to 25%[.]" *Id.* The Department argues that no additional notice or opportunity to be heard was required in the circumstances of this case.

First, citing *Montañez*, the DOC contends "the purpose of notice and meaningful opportunity to object 'is to protect against the possibility of error in the application of DOC policy, such as mistakes in reporting of an inmate's total liability or to ensure that

_____

(…continued)
WL 6139806, at *3. In *Beavers*, the Commonwealth Court cited directly to the Current DOC Policy, but did not mention the exception. *Beavers*, 2021 WL 5832128 at *3.

deductions are not made from funds that are exempt.'" *Id.* at 11-12 (quoting *Montañez*, 773 F.3d at 486). The DOC argues that Washington has failed "to articulate how the rate of 25% at which the monies would be deducted from his inmate wage and personal account will lead to errors in the Department's application of its Act 84 deduction policy." The maintains that, where only the rate of deduction had changed, any potential errors could have been addressed in response to the earlier notice provided before the Current DOC Policy came into effect. *Id.* at 12-13.

Second, the DOC avers that the rate change was a legislative act and that "long-standing precedent" holds that that "'[t]he protections of procedural due process do not extend to legislative actions.'"[23] *Id.* at 13-14 (quoting *Ne. Land Dev., LLC v. City of Scranton*, 942 F.Supp.2d 376, 387 (M.D. Pa. 2013) (citing *Rogin v. Bensalem Twp.*, 616 F.2d 680, 693 (3d Cir. 1980)). Because the rate change was initiated by a legislative act, the DOC argues that "the legislative process provide[d] all the due process" that was required. *Id.* at 14. The DOC contrasts legislative acts with "[a]djudicative acts," which, "on the other hand, require the provision of procedural due process." *Id.* "An act is 'adjudicatory' when the decision 'require[s] factual findings on the particular status of a particular individual,' while legislative decisions are those that 'rest on more general findings requiring analysis and evaluation of factors not uniquely related to any specific individual.'" *Id.* (quoting *Powelton Civic Home Owners Ass'n v. H.U.D.*, 284 F.Supp. 809, 829 (E.D.Pa. 1968)). Here, the DOC contends that the

> change in rate at which monies are to be deducted from
> [Washington]'s inmate account pursuant to Act 84 was done
> by legislative activity and was not adjudicatory in nature.
> The amendment to Act 84, passed by the Pennsylvania
> General Assembly, directing the Department … to deduct at

---

[23] This doctrine (hereinafter "Legislative Act Doctrine") originated in *Bi-Metallic Investment Company v. State Board of Equalization*, 239 U.S. 411 (1915).

least 25% of deposits made to an inmate wage and personal account applied to property of all inmates who are in the custody of the [DOC], not merely to [Washington] specifically. *Rogin*, 616 F.2d at 693. The [a]mendment to Act 84 constitutes an across-the-board change to the rate of deduction of a minimum of 25% for all inmates, rather than the specific application of the rate of deduction of a minimum of 25% to only [Washington]. *Id.* Thus, the [a]mendment to Act 84 can be characterized as a legislative act. *Id.*

DOC's Brief at 15.

Any process that was due regarding the amendment to Act 84 was, according to the DOC, provided by the legislative process. *Id.* at 15-16.[24] The DOC notes that the Ninth Circuit Court of Appeals "extended" this legislative act rationale "to inmates and deduction of inmate monies" in an unpublished case. *Id.* at 17; *see Craft v. Ahuja*, 475 F.App'x. 649 (9th Cir. 2012). In that case, the Ninth Circuit held that the "district court … properly dismissed Craft's procedural due process claim because the deductions" from his prisoner account "were effected by a valid act of the California legislature and the legislative process satisfies the requirements of procedural due process." *Craft*, 475 F.App'x at 650. Similarly, an intermediate appellate court in the State of Washington applied the same rationale. *See In re Metcalf*, 963 P.2d 911, 918 (Wash. Ct. App. 1998) ("When a challenge is to a legislative enactment, the legislative process provides all the process due."). Because the Act 84 rate change sets forth a mandatory minimum

---

[24] For this proposition, the DOC cites *Atkins v. Parker*, 472 U.S. 115, 128–30 (1985), where the High Court held that although welfare benefits are treated as a form of property protected by the Due Process Clause, Congress has "plenary power to define the scope and the duration of the entitlement to food-stamp benefits, and to increase, to decrease, or to terminate those benefits based on its appraisal of the relative importance of the recipients' needs and the resources available to fund the program[,]" and that the "procedural component of the Due Process Clause does not impose a constitutional limitation on the power of Congress to make substantive changes in the law of entitlement to public benefits." (internal citations and quotation marks omitted).

deduction rate, and because Washington was subject to the minimum deduction rate, the DOC contends that Washington is effectively challenging the constitutionality of the amendment, and "pursuant to *Bi-Metallic*[] and its progeny[,] . . . the protections of due process, notice and opportunity to be heard, do[] not extend to legislative actions, which is how the change in the rate of deduction to Act 84 came about." DOC Brief at 16-17.[25]

Third, the DOC endorses the Commonwealth Court's conclusion in *Beavers* that inmates were provided notice of rate change when Act 84 was published. *Id.* at 19. Thus, the DOC maintains that due process principles did not require the DOC to notify Washington of the rate change because he was presumed to know the law upon its enactment. *Id.* Fourth, the Department argues that the Commonwealth Court did not err in sustaining its preliminary objections based on the DOC's ostensible lack of discretion in applying the new 25% rate, contending that as "the Commonwealth Court in both *Washington* and *Beavers* noted, a hearing on the 25% statutory reduction rate would 'serve no purpose because the Department lacks the statutory authority to deduct less than 25% of deposits made to an inmate account.'" *Id.* at 20 (quoting *Beavers*, 2021 WL 5842128 at *5; *Washington*, 2021 WL 6139806 at *4). The DOC observes that Washington has not challenged the constitutionality of Act 84 or its 2019 amendment. *Id.*

Nevertheless, the DOC contends that, as amended, Act 84 clearly and unambiguously requires the DOC to apply the 25% minimum rate without exception. *Id.* at 21-23. As to Washington's argument that Section 9728(b)(5)(iv) permits deviation from that minimum, the DOC argues that the provision "confers upon the [DOC] some

---

[25] The DOC further argues that there "is no basis to conclude that the lack of a legislative process available to inmates changes the constitutional equation" because inmates have been lawfully disenfranchised. DOC's Brief at 18.

discretion in the procedure or policy that it chooses to implement in collecting the monies, it does not authorize the Department to change the will of the General Assembly to have less than a minimum of 25% of deposits from inmate accounts be deducted as [Washington] suggests." DOC's Brief at 24. For that reason, the DOC contends that "a hearing would serve no purpose because the [DOC] lacks the statutory authority to deduct less than 25% of the deposits made to an inmate's account"[26] and that Washington is therefore "not entitled to an opportunity to be heard to argue for a return to the 20% rate that was imposed at the time of his sentencing." *Id.*

Finally, the DOC maintains that Washington in not entitled to an ability-to-pay hearing "because he failed to preserve the issue." *Id.* at 25. The lower court stated that a change of circumstances might include the threat of additional sanctions for nonpayment, and *Bundy* suggested that a material change in circumstances "could be expanded to include circumstances where an inmate may lack sufficient funds to pursue or protect his legal rights[,]" but that Washington failed to challenge that holding by the lower court. *Id.*

C. Washington's Reply

In his reply brief, Washington accuses the DOC of failing to contend with the controlling precedents of *Bundy* and *Johnson*. He argues that under these authorities,

> the DOC was required to provide [him] notice of the increased "rate at which funds will be deducted from his account," *Bundy*, 184 A.3d at 553, and "a reasonable opportunity to explain why the past and/or intended deductions" at the 25% rate "should not take place notwithstanding the dictates of Act 84." *Johnson*, 238 A.3d at 1183[.] Indeed, this same essential holding has been reached in every precedent that has addressed

---

[26] *But see* Current DOC Policy §§ 2(B)(4)(a), 3(A)(2)(e)(1), 3(A)(2)(e)(2), 3(C)(2)(b)(1), and 3(F)(1-6).

constitutional due process within the context of Act 84 deductions.

Washington's Reply Brief at 3.

Furthermore, Washington alleges that the DOC only presents "two novel arguments" to support the Commonwealth Court's decision to dismiss Washington's complaint based upon the DOC's preliminary objections. He contends that both of the DOC's arguments—that the Legislative Act Doctrine applies and that it would be fruitless to provide a post-deprivation hearing—"are waived because they were not developed below." *Id.* at 4. In any event, Washington asserts that neither theory holds water.

As to the Legislative Act Doctrine, Washington contends that it was not raised in the DOC's preliminary objections (but for a fleeting mention in the brief filed in support of the preliminary objections), and should be deemed "forfeited" for lack of development below. *Id.* at 4-5. He also argues that the Legislative Act Doctrine does not apply in the circumstances of this case. He points out that he solely challenges "the DOC's decision to apply Act 84 to him, specifically its summary imposition of a 25% deduction rate" pursuant to the Current DOC Policy which implemented the 2019 amendment to Act 84. *Id.* at 6. Washington points out that in his pro se petition for review he never challenged the constitutionality of the 2019 amendment, but instead he contested the Current DOC Policy's implementation of the new Act 84 mandate. *Id.*

Because Washington asserted "his due process right to notice and an opportunity to be heard regarding the DOC's decision to apply Act 84 to him[,]" his challenge is to "an adjudicatory act triggering due process[,]" not the implementing legislation that might otherwise have implicated the Legislative Act Doctrine. *Id.* at 6-7. Washington further contends the DOC has admitted as much in its brief:

> As the DOC explains, "Act 84 required the Department to develop guidelines related to its responsibility under the statute," and the DOC did that by "developing policy, in the form of DC-ADM 005." DOC['s] Br[ief] at 7. Notably, that policy requires the DOC's "Business Manager [] to transmit to the inmate [a] Notification of Deductions Memo along with the official court documents relied upon to establish the deductions." *Id.* This individualized, adjudicatory procedure reaffirms that the DOC is fully in the driver's seat in deciding how Act 84 is applied to each person incarcerated in the Commonwealth. The DOC sets forth its own policy for how deductions are to occur and then makes its own individualized determination, based on its review of relevant documents, as to how and in what amount deductions are to be taken in each case.

Washington Reply Brief at 7. Additionally, Washington argues that Act 84 gives the Department "discretionary authority to select the rate of deduction applicable to" him and to "establish its own guidelines" regarding "how it will exercise that discretion." *Id.* (citing 42 Pa.C.S. § 9728(b)(5)(i) & (iv)). He claims that it is implicit in the obligation to set a minimum rate of 25% that the Department has the discretion to apply a greater rate. *Id.* at 8. Washington therefore contends that by "selecting a specific deduction rate," the DOC exercises judgment in "evaluating personal and financial circumstances, including with respect to the potential hardship that a high rate of deduction may impose both on the incarcerated person and his or her family and the impact on his or her rehabilitation both before and after imprisonment." *Id.* at 9.

Washington further insists that *Londoner v. City & County of Denver*, 210 U.S. 373 (1908), is the "seminal case" for making a distinction between legislative and adjudicative acts. *Id. Londoner* involved a statutory tax scheme. Although the Court determined that the taking of property via assessment, apportionment, and/or the collection of taxes was not itself adjudicatory, it nonetheless held that when the state delegated the authority to set the tax rate (and to determine upon whom it would be levied) to a subordinate institution, taxpayers were entitled to due process.

Washington's Reply Brief at 9 (citing *Londoner*, 210 U.S. at 385). Washington contends that this case is analogous in that the new Act 84 minimum deduction rate originated with a legislative act but his challenge is to the adjudicatory act by the DOC that applied that rate to him. *Id.* at 10.

Moreover, Washington maintains that the Department has failed to assert any controlling authority for its Legislative Act Doctrine argument. Rather, he argues that "the DOC principally resorts to out-of-state, often non-precedential appellate decisions and federal district court cases, none of which are on point." *Id.* at 10-11.[27] Moreover, Washington argues that, despite "the fact that the DOC chose to apply Act 84 in a uniform way" before the 2019 amendment "was not grounds for depriving the challengers in *Bundy* and *Johnson* of their rights to due process" under the legislative act theory. *Id.* at 13.

Next, Washington disputes the DOC's contention that the 25% minimum rate precluded any relief, thereby supplanting any need for a hearing because it would be a fruitless endeavor. Washington objects to our consideration of that rationale because the DOC did not include that argument when making its preliminary objections. *Id.* at 14 ("While it referenced the mandatory language of Act 84 in passing, no substantive argument was developed like the one it advances now."). Alternatively, Washington

---

[27] Washington discusses *Bi-Metallic*, one of the only United States Supreme Court cases cited by the DOC applying the Legislative Act Doctrine to a due process challenge, arguing that it is factually distinguishable. In contrast to *Londoner*, *Bi-Metallic* involved a due process challenge directed at a statute that set a uniform tax rate in Denver that "applied categorically across the board." *Id.* at 11 (citing *Bi-Metallic*, 239 U.S. at 443). Washington contends that his due process challenge targets only the DOC's exercising "its authority in applying" Act 84 "to him." *Id.* He argues that the same distinction can be made regarding the DOC's reliance on *Metcalf* and *Rogin*, although neither of those cases can be construed to control here. Washington's Reply Brief at 11-12.

argues that the DOC's argument lacks merit. First, he maintains that the constitutional mandate set forth in *Bundy* and *Johnson* cannot be disregarded merely because the General Assembly amended Act 84. *Id.* at 14-15. Furthermore, in amending Act 84 in 2019, "the General Assembly specifically included a provision in Act 84 that authorizes the DOC to develop 'guidelines' through which limited deviations may be permitted where appropriate." *Id.* at 15 (quoting 42 Pa.C.S. § 9728(b)(5)(iv)).

Washington points out that this Court's most recent consideration of Act 84 in *Johnson* occurred after the statute was amended; yet, this Court nevertheless stated that inmates must be given notice of the rate of deduction and the opportunity to object to deductions "notwithstanding the dictates of Act 84." *Id.* at 15 (quoting *Johnson*, 238 A.3d at 1183). Thus, he contends that due process always applies "when adjudicatory deprivations of property occur." *Id.* at 15. He further avers that, as this Court held in *Bundy*, due process does not only afford an opportunity to object to garnishment based on a recognized or general exemption. "[D]ue process serves another equal and '[j]ust as important' function: to 'avoid erroneous deprivations before they occur[.]'" *Id.* at 15 (quoting *Bundy*, 184 A.3d at 558). Thus, Washington contends that "even where no meritorious substantive challenge lies as to the rate of deduction, due process must be afforded." *Id.* at 15-16 (citing *Montañez*, 773 F.3d at 486 ("Because we find the deduction rate to be reasonable, the DOC need not entertain a challenge to the rate of deduction, though it must provide an opportunity for inmates to object to potential errors in the deduction process.")).

Finally, Washington concludes that the DOC's lack-of-discretion-to-afford-relief logic "is not … consistent with the DOC's own policy and practice under Act 84." *Id.* at 16. Washington points to the DOC's policy which exempts inmates from the 25% deduction for Act 84 if their accounts hold $10.00 or less. *Id.* at 16; *see* Current DOC

Policy, § 2(B)(4)(a). He contends that "nothing in the statute expressly speaks to such deviations, yet the DOC nevertheless has read Act 84 as permitting them." *Id.* at 17.[28] In any event, he reiterates this Court's statement in *Koehler*, 229 A.3d at 933 n.10, that the "right to a remedy is, itself, a right protected by due process" and our statement in *League of Women Voters*, 178 A.3d at 822, that this "Court possesses broad authority to craft meaningful remedies when required." *Id.* at 18.

D. Amici Curiae

Amici Curiae, the American Civil Liberties Union, the Juvenile Law Center, Mothers of Incarcerated Sons, the Pennsylvania Institutional Law Project, and Dr. Lisa Servon[29] (collectively, "Amici"), filed a brief endorsing Washington's arguments. Amici wrote "separately to emphasize the significant harms that increased deductions may create." Amici's Brief at 4.[30]

---

[28] In this regard, Washington posits that the disconnect between the Current DOC Policy and the Department's arguments in this case demonstrate "that Act 84, at the very least, is 'reasonably susceptible to two interpretations.'" Washington's Reply Brief at 17 (quoting *Moore v. Jamieson*, 306 A.2d 283, 292 (Pa. 1973)). In such circumstances, he contends that this Court cannot presume a result that offends the Constitution, nor assume a legislative intent to "effectuate a substantial change to time-honored legal principles" absent clear and unmistakable evidence of such intent. *Id.* (quoting *In re Trust Under Deed of David P. Kulig Dated Jan. 12, 2001*, 175 A.3d 222, 238 (Pa. 2017)). "Consistent with these principles," Washington argues, "it should be presumed that the General Assembly did not intend to contravene *Bundy*'s well-settled constitutional analysis," nor did it "intend to leave the DOC powerless to make reasonable, limited exceptions to a presumptive deduction rate where compelling cases of hardship show that someone's property should not be further deprived." *Id.* at 17.

[29] Dr. Servon, a professor at the University of Pennsylvania, has conducted research into financial justice and mass incarceration.

[30] Amici argue that, contrary to the DOC's representations, "[p]risons do not provide incarcerated individuals with all of the necessities they require free of charge" and, consequently, "[f]inancial accounts play a significant role in ensuring the necessities of life for those in state prisons, even with the low balances held by many." Amici's Brief at 8. They cite national studies showing "that without sufficient funds in commissary (continued…)

---

accounts, incarcerated individuals are unable to meet their nutritional needs, pay for medical co-pays, and communicate with family and the courts." *Id.* For example, one study cited by Amici that examined commissaries in Illinois and Massachusetts demonstrated that up to 84% "of funds spent at the commissary go[] toward food and hygiene products." *Id.* at 9. Additionally, inmates are also responsible for paying for clothing, medical and pharmaceutical needs, and costs for personal and legal correspondence. *Id.*

Amici explain that paying for these necessities through prison work is a Sisyphean task, with typical prison wages ranging from $0.19 to $0.42 an hour under the DOC's stewardship, or less than three to six percent of the federal minimum wage of $7.25 an hour. *Id.* at 22. At those rates, inmates need to work four to eight hours to buy aspirin, seventeen to thirty-eight hours to purchase menstrual pads, and twenty-four to fifty-three hours to obtain a $10.00 phone card based on the DOC's commissary prices. *Id.* at 10. "A five-percent increase in the amount deducted from someone's financial account is therefore hugely significant" in that prison economy, which forces "many individuals to make difficult choices between having enough food to eat, dealing with a pounding migraine, or calling their family." *Id.* at 9-10.

Apart from prison work, Amici explain that inmate accounts are primarily funded from "personal deposits upon entering prison" and "deposits from family members or friends." *Id.* at 21. Because prisoners are disproportionately unemployed or underemployed prior to incarceration, inmates tend to be "dependent on their families for regular gifts in order to meet their needs." *Id.* at 24. And when families choose to bear the burden of providing their incarcerated loved ones with financial assistance to pay for necessities, they are hit with processing fees of up to 20% of the amount of their deposits even before Act 84 extracts its toll. *Id.* Consequently, Amici advise that "[t]hese fees, together with heightened deductions for court costs, may make families hesitant to deposit any funds in their loved ones' accounts." *Id.* at 25.

Amici further contend that when "funds are subject to deductions, the ripple effect impacts [inmates'] families as well, as 'the payment of fines, costs, and restitution'" effectively "shifts from the convicted individual to their family, whose gifts are subject to the deductions and who must then give that much more money to make up for the deductions." *Id.* Amici believe this shift has a "ripple effect" that ultimately exacerbates the "the long-term harms of incarceration on individuals' immediate families[,]" and only more so when the Act 84 deduction rate is increased. *Id.* Moreover, Amici contend that "[a]dditional deductions also reduce the amount individuals will have on hand to cover their basic living costs upon re-entry," which tends to frustrate their ability to find employment and obtain housing upon release. *Id.* at 28-29.

Finally, in addition to supporting Washington's due process claims generally, Amici caution this Court not to presuppose the adequacy of the due process provided regarding an inmates' ability to pay at sentencing, noting that

(continued…)

## III. Analysis

"Our review of an order sustaining preliminary objections in the nature of a demurrer is de novo and plenary." *Bundy*, 184 A.3d at 556. "Preliminary objections should be sustained only in cases that are clear and free from doubt." *Pennsylvania AFL-CIO ex rel. George v. Commonwealth*, 757 A.2d 917, 920 (Pa. 2000). Appellate review of an order sustaining preliminary objections consists of determining "whether it is clear from doubt from all the facts pleaded that the pleader will be unable to prove facts legally sufficient to establish a right to relief." *Id.* Here, the Commonwealth Court sustained the DOC's preliminary objections because it "discern[ed] no due process claim" based on its conclusion that the Department had no additional due process obligation to Washington occasioned by the increase to the Act 84 deduction rate applied to him. Thus, in its most general form, the question before us is whether the Commonwealth Court erred in holding that there were no forms of relief to which Washington was entitled based on his claim that the DOC violated his right to procedural due process.[31]

---

(…continued)

> [w]hile discretionary fines can only be imposed based on a defendant's ability to pay per *Commonwealth v. Ford*, 217 A.3d 824 (Pa. 2019), current Superior Court case law says that so-called "mandatory" fines must be imposed regardless of ability to pay. *See, e.g., Commonwealth v. May*, 271 A.3d 475 (Pa. Super. [] 2022) [()petition for allowance of appeal filed 129 MAL 2022[)]. Restitution must also be imposed without any consideration of the defendant's finances. *See* 18 Pa.C.S. § 1106(c).

*Id.* at 35 (footnote omitted).

[31] The Commonwealth Court separately sustained the DOC's preliminary objections as to Washington's distinct claim that he was entitled to an ability-to-pay hearing. Washington has not raised a challenge to that ruling in this appeal.

Under this general framework, we observe that Washington's two claims are interrelated. His first claim concerns whether he was entitled to notice and an opportunity to be heard before the DOC increased the Act 84 deduction rate applicable to him. Washington's second claim challenges one of the Commonwealth Court's specific justifications for answering his first question in the negative—that the minimum deduction rate of 25% established under the current version of Act 84 prevented the DOC from affording relief, such that any remedy required by due process principles would be fruitless. As we ultimately view the second claim as subsidiary to the first in the context of this appeal, we will address them together.

A. Act 84 Precedent

No state may "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. amend. XIV § 1. This axiom of American jurisprudence, termed procedural due process, "imposes constraints on governmental decisions which deprive individuals" of any of these fundament rights. *Mathews v. Eldridge*, 424 U.S. 319, 332 (1976). To deprive an individual of a property interest, procedural due process dictates that at least "some form of hearing is required" before the taking occurs. *Id.* at 333. The right to a hearing is not merely formalistic; it must be conducted "at a meaningful time and in a meaningful manner." *Id.* (quoting *Armstrong v. Manzo*, 380 U.S. 545, 552 (1965)). And although flexible to accommodate different circumstances in which due process concerns arise,

> identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*Id.* at 335 (hereinafter, "the *Mathews* Test").

Importantly, the right to procedural due process is distinct from the right the government seeks to impair. "Procedural due process rules are meant to protect persons not from the deprivation, but from the mistaken or unjustified deprivation of life, liberty, or property." *Carey v. Piphus*, 435 U.S. at 259. While the requirements of procedural due process vary across different contexts, the United States Supreme Court "repeatedly has emphasized that procedural due process rules are shaped by the risk of error inherent in the truth-finding process[.]" *Id.* (quotation marks omitted) (citing *Mathews*). These rules are intended to "minimize substantively unfair or mistaken deprivations of life, liberty, or property by enabling persons to contest the basis upon which a State proposes to deprive them of protected interests." *Id.* (quotation marks omitted).

In this case, we consider a government taking of a peculiar sort, one that is authorized by statute and designed to compensate victims and the government for the consequences of criminal acts and the costs of prosecution. In 1998, our General Assembly passed Act 84, which, inter alia, permitted the DOC to make deductions from inmates' prisoner accounts during their incarceration. Act 84 deductions are governed by Section 9728 of the Judicial Code. Following its 2019 amendment, Act 84 reads, in pertinent part:

> (5) Deductions shall be as follows:
>
> > (i) The Department of Corrections shall make monetary deductions of at least 25% of deposits made to inmate wages and personal accounts for the purpose of collecting restitution, costs imposed under section 9721(c.1), filing fees to be collected under section 6602(c) (relating to prisoner filing fees) and any other court-ordered obligation.

. . .

> (iv) The Department of Corrections and each county correctional facility shall develop guidelines relating to its responsibilities under this paragraph. The guidelines shall be incorporated into any contract entered into with a correctional facility.

42 Pa.C.S. § 9728(b)(5). It is undisputed that prior to the 2019 amendment, Act 84 did not dictate a particular deduction percentage. Pursuant to its internal polices, the DOC typically deducted 20% from an inmate's deposits, which was the rate applied to Washington before it increased to 25% in 2020.

This Court first addressed the due process implications of the pre-amended version of Act 84 in *Buck*. Darryl Buck, imprisoned since 2001, was ordered "to pay fines, costs, and restitution in the amount of $10,000.00." *Buck*, 879 A.2d at 158. Pursuant to Act 84, the DOC began deducting 20% from deposits to Buck's account in 2002 to satisfy his court-ordered financial obligations. *Id.* Buck filed a complaint in the Commonwealth Court alleging a due process violation and seeking to enjoin the DOC from making the deductions without an ability-to-pay hearing. *Id.* at 159. An en banc panel of the Commonwealth Court sustained the DOC's preliminary objections.[32]

On appeal from that decision, Buck argued that in implementing Act 84 the DOC had violated his due process rights by failing to seek a hearing before the trial court. He

_____

[32] The Commonwealth Court first rejected Buck's claim that the DOC did not have the authority to determine the amount of deductions based on the argument that only trial courts had the authority to impose installment payments, reasoning that Act 84 specifically delegated that authority to the DOC. *See Buck v. Beard*, 834 A.2d 696, 701 (Pa. Commw. 2003) (en banc), *aff'd*, 879 A.2d 157 (Pa. 2005). The court also rejected Buck's assertion that, even if the DOC had been authorized to make the deductions, that it had created a financial hardship, reasoning that "a general allegation that he cannot afford to have 20 percent of his funds deducted is not a sufficient allegation to establish any harm." *Id.*

alleged "that the appropriate procedure is for the trial court to determine, at the sentencing hearing, the percentage of the monthly deduction from an inmate's account[,]" and that the DOC's taking "funds from his account without such a pre-deprivation hearing fails to satisfy the requirements of due process." *Id.* at 159-60. This Court "[d]istilled" the question before it to "whether due process requires a specific **judicial determination** of ability to pay before the" DOC makes deductions pursuant to Act 84. *Id.* at 160 (emphasis added).

In rejecting that narrowly framed issue, the *Buck* Court first recognized that prisoners have a cognizable property interest in their inmate accounts. *Id.* at 160. *Buck* further acknowledged that, "because prisoners have a property interest in their accounts, 'inmates are entitled to due process with respect to any deprivation of this money.'" *Id.* (quoting *Reynolds v. Wagner*, 128 F.3d 166 (3d Cir. 1997)). However, this Court determined that Buck "had notice and an opportunity to be heard at his sentencing hearing" because "he was on notice of the" DOC's "statutory authority to deduct funds from his account" at the time of the hearing (fulfilling the notice requirement), and because "he had the opportunity to present evidence to persuade the court not to impose fines, costs, and restitution" (fulfilling the hearing requirement). *Id.* Thus, this Court concluded that Buck's "sentencing hearing provided him with the required pre-deprivation due process." *Id.* at 161.

Subsequently, in *Montañez*, a consolidated appeal in the Third Circuit, the plaintiffs, Montañez and Hale, filed claims under 42 U.S.C. § 1983 alleging that they had been deprived of their procedural due process rights when their prisoner accounts were subject to automatic deductions pursuant to Act 84. *Montañez*, 773 F.3d at 476-77. The DOC's policy at that time provided for a 20% rate for Act 84 deductions, with the

caveat that that Act 84 deductions would only be made if the inmate's balance exceeded $10.00. *Id.* at 477. The *Montañez* court recognized that the

> DOC's authority to make deductions is automatically triggered when it receives a sentencing order that includes a monetary portion. There is no requirement in the Policy that the relevant court order contain a provision for the automatic deduction of funds from an inmate account. The DOC does not provide inmates with any hearing or other opportunity to be heard before the deductions commence.

*Id.*

The Third Circuit rejected Montañez's claim as untimely, and thus focused the remainder of its opinion on Hale's Section 1983 due process claim.[33] With regard to Hale, "it was undisputed that the DOC provided no opportunity for Hale to be heard regarding his record of court-ordered monetary obligations or the automatic deductions." *Id.* at 478. However, there was a factual dispute between the parties regarding "the exact parameters of the notice Hale received regarding the DOC Policy and Act 84 upon his intake to the DOC prison system." *Id.* at 477. No specific notice of the DOC's policy or its Act 84 deduction rate had been provided at Hale's sentencing hearing, and

---

[33] Montañez admitted "that he received an inmate account statement every month, which included a debit described as 'Act 84 transaction.'" *Montañez*, 773 F.3d at 479. Montañez was not advised of the DOC's Act 84 polices at sentencing, nor had his total financial obligation been finalized at that time. *Id.* at 478. Montañez also disputed whether he had been notified of the DOC's Act 84 policies upon his entry into the prison system. However, unlike Hale, prior to filing his Section 1983 claim, Montañez had previously filed a direct appeal from his judgment of sentence, and later filed petitions and other requests to modify his court-ordered financial obligation. *Id.* at 479. The Third Circuit determined that Montañez knew or should have known of the Act 84 deductions within a month of the first garnishment, as he "received an inmate account statement that reflected the debit from his account" within "a month of the first deduction[.]" *Id.* at 480. "The statute of limitations for a § 1983 claim arising in Pennsylvania is two years[,]" but Montañez did not file his complaint in federal district court until more than four years after his claim accrued. *Id.*

the total costs assessed to him were "not determined until sometime after the sentencing hearing." *Id.* Both parties agreed that "inmates have a constitutional property interest in funds held in prison accounts." *Id.* at 482. Thus, the Court turned to consider whether the DOC officials "provided sufficient process when they implemented the DOC Policy and deducted funds from Hale's inmate account." *Id.*

The court first emphasized that Hale was not challenging his sentence or the sentencing court's imposition of financial obligation for fines, restitution, and costs, nor did he claim that any additional process must be given by the Pennsylvania courts rather than DOC administrators. *Id.* (recognizing *Buck*'s rejection of "the argument that the due process considerations require a judicial default hearing before deductions may be made from inmate accounts"). Rather, Hale's claim was "narrowly focused on whether inmates must be provided with notice of the DOC['s Act 84] Policy and an opportunity to be heard regarding application of th[at] Policy prior to the first deduction," and whether the existing procedures implemented were sufficient in that regard. *Id.* at 482–83.

The *Montañez* court then turned to consider the *Mathews* Test:

> (1) "the private interest that will be affected by the official action", (2) "the risk of an erroneous deprivation of such interest through the procedures used" and the value of "additional or substitute procedural safeguards", and (3) the governmental interest, "including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirements would entail."

*Id.* at 483 (quoting *Mathews*, 424 U.S. at 335).

The court concentrated on the second and third factors, as there was no dispute regard the first.[34] The Third Circuit thus considered whether "additional pre-deprivation process" beyond that provided by a sentencing hearing "would be effective and whether that process would be overly burdensome on the government." *Id.* at 483. The court recognized the "default" rule that the government should provide a pre-deprivation hearing, if feasible, "regardless of 'the adequacy of a post[-]deprivation tort remedy to compensate for the taking[,]'" if pre-deprivation safeguards would be useful. *Id.* (quoting *Zinermon v. Burch*, 494 U.S. 113, 132 (1990)). If the default rule does not apply, such as where a "pre-deprivation process is not feasible," or where "pre-deprivation hearings are impractical or would be meaningless," no pre-deprivation process is required. *Id.* at 483-84. Summarizing its review of cases applying these principles, the court stated:

> [W]hen pre-deprivation process could be effective in preventing errors, that process is required. When deductions from inmate accounts involve "routine matters of accounting" based on fixed fees[35] or where temporal

---

[34] No party contested that state prisoners "have a property interest in the funds in their inmate accounts." *Montañez*, 773 F.3d at 483 (citing *Reynolds*, 128 F.3d at 179). Furthermore, there was no quarrel regarding the Commonwealth's "'important state interest' in collecting restitution, costs, and fines from incarcerated criminal offenders to compensate victims." *Id.* (quoting *Mahers v. Halford*, 76 F.3d 951, 956 (8th Cir. 1996)). Thus, as to the third *Mathews* Test factor, the court focused on the burdens on the government that would be imposed through the implementation of additional procedural safeguards.

[35] In *Tillman v. Lebanon County Correctional Facility*, 221 F.3d 410 (3d Cir. 2000), the Third Circuit found it was "impractical to expect the prison to provide pre[-]deprivation proceedings" for a per diem charge for housing expenses. *Id.* at 422. Importantly, in *Tillman*, the Third Circuit found it significant that no prison services were denied if the prisoner's account was overdrawn due to the fees, nor could inability to pay result in "extended prison time or reincarceration." *Id.* at 414. The cost recovery program involved "routine matters of accounting, with a low risk of error[,]" and any such errors could "be corrected through the prison's grievance program without any undue burden on a prisoners' rights." *Id.* at 422. Moreover, the Third Circuit indicated that Tillman had adequate notice of both the cost recovery and grievance policies, and he "had an (continued…)

> exigencies require immediate action,[36] pre-deprivation
> hearings are not required. In either event, however, inmates
> are entitled to some pre-deprivation notice of the prison's
> deduction policy.

*Montañez,* 773 F.3d at 484 (internal citations omitted).

Applying these principles to the Act 84 deductions from Hale's account, the court determined that there was "nothing about the DOC Policy that requires the DOC to take immediate action to deduct funds from inmate accounts to satisfy court-ordered obligations." *Id.* It found that a "short delay that might result from offering inmates an opportunity to be heard on application of the DOC Policy before it is applied would not seriously undermine the Commonwealth's ability to recover costs." *Id.* Unlike the assessments in *Tillman*, the Third Circuit found that the DOC's Act 84 policy did "not involve fixed assessments that uniformly apply to all inmates[,]" and "pre-deprivation process would mitigate at least some risk of error." *Id.*[37] Moreover, the court stated that

---

(…continued)
adequate post[-]deprivation remedy in the grievance program." *Id.* "On the other hand, to require pre[-]deprivation proceedings for what are essentially ministerial matters would significantly increase transaction costs and essentially frustrate an important purpose of the program, which is to reduce the county's costs of incarcerating prisoners." *Id.*

[36] In *Reynolds*, the Third Circuit held that no pre-deprivation process for the authorization of medical fees was required before they were deducted from inmate accounts. *Reynolds* reasoned, inter alia, that "delaying treatment while prison officials haggled with an inmate about signing a form authorizing the assessment of a fee could lead to frustrating and hazardous Eighth Amendment problems" as prison officials are constitutionally required to provide medical treatment in a variety of circumstances. *Reynolds*, 128 F.3d at 180.

[37] The court identified both actual error in the calculation of Hale's total Act 84 obligation, as well as hypothetical risks of error given discretionary aspect of the DOC's Act 84 policy involving exemptions. In deference to Hale's factual averments given the court's standard of review, Hale had not received notice of his total obligation, and had not been afforded an opportunity to object despite an obvious actual error in the DOC's calculation of the amount of restitution he owed. *Montañez,* 773 F.3d at 484. (continued…)

"pre-deprivation process need not be administratively burdensome[,]" recognizing that other states "have been able to implement pre-deprivation process in similar circumstances." *Id.* at 484. Applying the *Mathews* Test, the court concluded that "the government's interest in collecting restitution, fines, and other costs from convicted criminals does not overcome the default requirement that inmates be provided with process before being deprived of funds in their inmate accounts," rejecting the District Court's determination that the DOC's post-deprivation grievance procedure satisfied procedural due process. *Id.* at 485.

We adopted *Montañez*'s rationale regarding Act 84 deductions in this Court's unanimous decision in *Bundy*. As is the case here, Bundy exhausted his administrative remedies before seeking judicial relief. *Bundy*, 184 A.3d at 553. In Bundy's complaint, he asserted that the DOC had violated the dictates of *Montañez* by failing to afford him pre-deprivation notice and an opportunity to be heard prior to making Act 84 deductions from his prison account. *Id.* at 554. The Commonwealth Court sustained the DOC officials' preliminary objections in the nature of demurrer, reasoning that adequate notice had been provided because Bundy "was aware of the amounts he owed and had unsuccessfully sought relief from those obligations in the common pleas court." *Id.* at 555.

After resolving other matters, this Court addressed Bundy's due process claim. Citing *Buck*, *Tillman*, and *Montañez*, we recognized that prisoners have a cognizable property interest in the money in their prisoner accounts, the deprivation of which must

---

(…continued)
Moreover, the court recognized "a pre-deprivation opportunity to object to the assessments might [also] prevent deductions from being made from funds exempt from the DOC's policy." *Id.*

comport with due process principles. *Id.* at 556. Citing *Zinermon*, we acknowledged that due process is a fluid concept across different circumstances, the particulars of which are determined by consideration of the *Mathews* Test. *Id.* at 557. Moreover, we restated *Mathews*' mandate that the "central demands of due process are notice and an opportunity to be heard at a meaningful time and in a meaningful manner." *Id.* (quotation marks omitted).

The *Bundy* Court then highlighted that the second *Mathews* Test factor "reflects that avoiding erroneous deprivations before they occur is an important concern under the Due Process Clause" and that there "is thus a general preference that procedural safeguards apply in the pre-deprivation timeframe." *Id.* *Bundy* recognized that pre-deprivation process is not feasible in all circumstances, and when not feasible, "the availability of a meaningful post-deprivation remedy satisfies due process." *Id.* However, *Bundy* clarified that the availability of a post-deprivation remedy is not dispositive of a due process claim, recognizing the United States Supreme Court's directive that the "controlling inquiry is solely whether the state is in a position to provide for pre[-]deprivation process." *Id.* (citing *Hudson v. Palmer*, 468 U.S. 517, 534 (1984)).[38]

---

[38] In *Hudson*, a prisoner, Palmer, alleged that a prison official, Hudson, intentionally destroyed Palmer's property while conducting a "shakedown search" of his cell. *Hudson*, 468 U.S. at 530. Among other constitutional challenges, Palmer alleged that Hudson's actions "deprived him of property without due process, in violation of the Due Process Clause of the Fourteenth Amendment[,]" arguing that pre-deprivation process should have been provided. *Id.* The lower court had rejected Hudson's due process claim on the basis that no violation had occurred because of the existence of "state tort remedies available to redress the deprivation[.]" *Id.* at 520. *Hudson* rejected that reasoning, stating that "post[-]deprivation procedures satisfy due process" only when "**the state** cannot possibly know in advance of a negligent deprivation of property[,]" and so the "controlling inquiry is solely whether **the state** is in a position to provide for pre[-]deprivation process." *Id.* at 534 (emphasis added). In addressing the feasibility of providing pre-deprivation process, *Hudson* determined it was "of no consequence" (continued…)

As there were no issues raised regarding the feasibly of providing pre-deprivation process for Act 84 deductions made pursuant to the DOC's Act 84 policy, and because it was immaterial to its analysis whether any post-deprivation remedy was available, the *Bundy* Court next considered whether legitimate state interests would be burdened by implementation of a pre-deprivation process. We deemed any such concerns to be speculative at best, reasoning that, in balancing an inmate's interests against institutional concerns,[39] "the provision of notice and a meaningful (if informal) means to challenge the amount of the debt, assert an exemption, or otherwise raise an objection to the deduction scheme, seems unlikely to impact upon these institutional goals." *Id.* at 558. And, "[j]ust as important," providing pre-deprivation process "can potentially avoid erroneous deprivations before they occur[.]" *Id.* Thus, *Bundy* agreed with *Montañez* that the DOC "must, prior to the first deduction: (a) inform the inmate of the total amount of his financial liability as reflected in his sentencing order, as well as the Department's policy concerning the rate at which funds will be deducted from his account and which funds are subject to deduction; and (b) give the inmate a reasonable opportunity to object to the application of the Department's policy to his account." *Id.* at 558–59. *Bundy* added that this pre-deprivation procedure would help minimize errors in the

_____

(…continued)

whether "an individual employee himself is able to foresee a deprivation[,]" finding that the "state can no more anticipate and control in advance the random and unauthorized intentional conduct of its employees than it can anticipate similar negligent conduct." *Id.* at 533-34. Thus, we take from *Hudson*, as we did in *Bundy*, that an inquiry into the feasibility of pre-deprivation process is focused not on the availability (or adequacy) of a post-deprivation process, or the specific intentions of individual prison officials, but on the institution's ability to provide pre-deprivation process.

[39] *Bundy* identified the relevant institutional concerns as "securing the prison's physical plant, maintaining order, safety, and discipline, and providing for prisoners' rehabilitative needs." *Bundy,* 184 at 558. Certainly, the DOC also has an interest in implementing Act 84 fairly and efficiently.

DOC's "application of its Act 84 deduction policy without significantly impeding its ability to carry out essential functions" in accordance with *Mathews*. *Id.* at 559.

*Bundy* concluded that the Commonwealth Court erred in sustaining preliminary objections, in part, because Bundy "was not given pre-deprivation notice concerning the amount he owed or an opportunity to object." *Id.* Critically for purposes of our decision today, *Bundy* did not make its decision contingent upon the prisoner's proof of a "concrete harm[.]" *Id.* To the contrary, *Bundy* stated that "if a procedural due process violation is demonstrated, nominal damages may be warranted[.]"[40] We further recognized that that Bundy had additionally "asked for declaratory and injunctive relief" in any event. *Id.* Thus, *Bundy* concluded that the law did "not say with certainty that no relief is available[,]" and it therefore reversed the order sustaining preliminary objections. *Id.* at 559-60.

Only two years later, in *Johnson*, we again confronted the due process implications of Act 84. Convicted in March of 2013, Johnson was ordered to pay $1,166 for costs and contributions to the Crime Victims' Compensation Fund. *Johnson*, 238 A.3d at 1175-76. In June of 2013, the DOC made its first Act 84 deduction from Johnson's prison account, and Johnson unsuccessfully challenged the legality of that deduction through the DOC's grievance process in July of 2013. *Id.* at 1176. As discussed above, *Montañez* was issued the following year, and *Bundy* followed in 2018. Soon after *Bundy* was issued, Johnson filed another grievance, seeking the return of all his Act 84 deductions (then totaling $860) as recompence because he had been denied pre-deprivation process before the first deduction was made. *Id.* at 1176-77. The DOC

_____

[40] *Bundy* specifically cited the United States Supreme Court's decision in *Carey v. Piphus*.

denied this request for relief, reasoning that Johnson failed to demonstrate any error relative to the DOC's Act 84 policy, but suspended his Act 84 deductions for three weeks to provide him with the opportunity to provide evidence of any such error. *Id.* at 1177. Instead, Johnson filed an administrative appeal, arguing that the DOC's post-deprivation remedy "was insufficient in light of *Bundy*[,]" which the DOC denied. *Id.*

Johnson then filed a petition for review in the Commonwealth Court stating a replevin claim, seeking to recover the $860 plus interest. *Id.* He also alleged a due process violation due to the DOC's failure to afford him an ability-to-pay hearing based on an alleged change in circumstances, premised on language in *Bundy* suggesting the potential viability of such a claim. *Id.* In an amended Petition, Johnson added a negligence claim pertaining to the DOC's general failure to afford him pre-deprivation process before making Act 84 deductions and for misinforming him of the legality of those deductions in response to his original grievance.[41]

In advancing its preliminary objections in the nature of demurrer, the DOC presented a variety of challenges to Johnson's negligence claim and maintained that, under *Buck*, it had no obligation to provide an ability-to-pay hearing. The Commonwealth Court sustained the DOC's preliminary objections. Pertinent here, the Commonwealth Court rejected Johnson's due process claim because that claim ostensibly accrued when the DOC "made its first Act 84 deduction from Appellant's

---

[41] "In terms of relief, [he] again asked for a refund of the monies the [DOC] had withdrawn from his account, together with interest, fees, and nominal damages." *Johnson*, 238 A.3d at 1178.

account in 2013, with the result that the two-year statute of limitations had expired by the time Appellant filed his petition for review in 2018." *Id.* at 1179.[42]

We reversed the Commonwealth Court's order sustaining the DOC's preliminary objections with respect to Johnson's due process claim.[43] This Court first recognized that Johnson and similarly-situated inmates were "placed in a difficult position as their first Act 84 deduction occurred before the holdings in *Bundy* and *Montañez* were announced[,]" and as such, "could not have relied on those decisions as a basis to demand pre-deprivation procedural safeguards" but nonetheless "may have had grounds such as those outlined in *Bundy* to challenge the validity of the" DOC's Act 84 policy. *Id.* at 1182. However, citing *Bundy*, the *Johnson* Court recognized that a meaningful post-deprivation remedy can satisfy the requirements of procedural due process when a pre-deprivation process is not feasible. *Id.* Consequently, *Johnson* held that

> that aspect of *Bundy* applies to inmates whose accounts were subject to Act 84 deductions without the benefit of pre-deprivation safeguards. Thus, due process requires that the [DOC], in response to an administrative grievance which accurately recites that no *Bundy* process was afforded prior to the first Act 84 deduction, must give the grievant notice of the items required by *Bundy* and a reasonable opportunity to explain why the past and/or intended deductions should not take place notwithstanding the dictates of Act 84. Any meritorious challenge along these lines would then implicate

---

[42] In *Morgalo v. Gorniak*, 134 A.3d 1139, 1147-48 (Pa. Commw. 2016), the Commonwealth Court held that the two-year statute of limitations provided in Section 5524(6) of the Judicial Code applies to Act 84 deductions. *See* 42 Pa.C.S. § 5524(6) (setting a two-year statute of limitations for an "action against any officer of any government unit for the nonpayment of money or the nondelivery of property collected upon on execution or otherwise in his possession").

[43] The *Johnson* Court affirmed with respect to the Commonwealth's Court's dismissal of Johnson's negligence claim.

the substantive remedy of restoring the prisoner's wrongly-deducted funds to his or her account.

*Id.* at 1182-83. In a footnote, *Johnson* clarified that "**for a challenge to be meritorious**, it is not enough that pre-deprivation procedures were not afforded to the grievant. He must also identify some substantive basis to conclude the Act 84 deductions were, or would be, contrary to law." *Id.* at 1183 n.10.

Applying that standard, this Court held that that the DOC's suspension of deductions to permit Johnson to compile documentation to challenge the DOC's Act 84 deduction policy appeared consistent with the due process mandate that an individual be afforded the opportunity to be heard at a meaningful time in a meaningful manner, but the Court was concerned "whether all of the information contemplated by *Bundy* and *Montañez* was given to Appellant when the deductions were temporarily suspended" and remanded "for further factual development." *Id.* at 1183. The Court specified that the DOC was required to notify an inmate of 1) the DOC's Act 84 policy; 2) the "total financial obligation to the government;" 3) "the rate at which funds will be deducted;" and 4) "the identity of the funds subject to withdrawal." *Id.*

Finally, the *Johnson* Court considered if Johnson was entitled to an administrative ability-to-pay hearing before the DOC. *Id.* The Court provided multiple justifications for rejecting that claim. First, Johnson neglected to allege a change in circumstances between sentencing and the first Act 84 deduction. *Id.* at 1184. Second, Johnson did not allege that an inability to pay would impact either his ability to litigate his pending PCRA petition, or that it would otherwise carry a risk of prolonged confinement or supervision. *Id.* In any event, *Johnson* stated that any impact on his PCRA petition had been rendered moot because the matter has "been litigated to completion[.]" *Id.*

<u>B. Was Washington entitled to notice and an opportunity to be heard before the DOC made deductions from his inmate account at a higher rate authorized by the amendment to Act 84?</u>

Washington maintains that he was entitled to notice and an opportunity to be heard when the DOC increased the rate of Act 84 deductions from his prison account from 20% to 25%. The Commonwealth Court acknowledged the due process rights articulated under *Bundy* and *Johnson* but distinguished the instant matter on the grounds that it first articulated in *Beavers*. For the reasons that follow, we reject each of the Commonwealth Court's various theories supporting its decision as endorsed by the DOC and, instead, agree with Washington that the change to the DOC's Act 84 policy required additional pre-deprivation notice and an opportunity to be heard before the increased rate was applied.

*1. Legislative Notice Rationale*

a.      In *Beavers*, the Commonwealth Court found that notice of the new rate had already been provided because "inmates, like all citizens, are presumed to know the laws of this Commonwealth, including … the current language of Act 84," invoking the ancient maxim that ignorance of the law is no excuse. *Beavers*, 2021 WL 5832128 at *4.[44] This theory starts from multiple faulty premises. First, Washington did not challenge the constitutionality of Act 84 (as amended) on due process grounds. Second, Washington's challenge is to the DOC's failure to afford him notice and an opportunity to be heard in response to its new Act 84 policy. The 2019 amendment to Act 84 provides that the DOC "shall develop guidelines relating to its responsibilities" for deductions made pursuant to Act 84." 42 Pa.C.S. § 9728(b)(5)(iv). Act 84 authorized

---

[44] The lower court did not explicitly rely on this rationale, but it did rely on *Beavers* generally. Accordingly, we address it.

the DOC to implement the 25% minimum deduction rate and Act 84 and the DOC's Act 84 policies are distinct governmental acts. Third, for the reasons discussed infra, the Current DOC Policy demonstrates that the two are in fact distinct because the DOC acts with discretion in implementing Act 84. Thus, the legislative amendment to Act 84 could not have fully apprised Washington of the precise nature of and manner in which the government would take his property.

b. No less important, however, is that *Beavers*' rationale is at odds with our Act 84 precedents. If inmates are deemed to be fully on notice of the DOC's Act 84 deduction policies at the time Act 84 became effective, the notice requirements for such deductions as set forth in *Montañez*, *Bundy*, and *Johnson* would be rendered moot.

Our rejection of this legislative-notice rationale is driven by our decision in *Bundy*. In *Bundy*, the DOC argued

> that we should follow *Buck* instead of *Montañez*, since the former represents binding precedent from this Court, whereas the latter is merely instructive. In fact, *Buck* is controlling as to some aspects of the question before us. *Buck* stated that, because [Act 84] went into effect before sentencing occurred, the defendant had adequate notice of the Department's authority under Act 84 to deduct funds from his account. The same reasoning applies to [Bundy] as he too was sentenced after [Act 84] became effective. *Buck* additionally established that due process does not require the [DOC] to arrange for a judicial ability-to-pay hearing before making deductions. As the Third Circuit recognized, however, *Buck* did not deal with whether any sort of administrative pre-deprivation process is constitutionally required before the first deduction is made.

*Bundy*, 184 A.3d at 558 n.5. Similarly, here, there is no challenge to the legislature's power to craft the amendment to Act 84 or the DOC's authority to implement that legislative scheme. Our concern, therefore, is not whether Washington was notified of the contents of the statute, but whether he was adequately notified of critical elements

of the Current DOC Policy implementing the amendment and whether he was afforded the opportunity to challenge it before his property was garnished at the higher rate. Moreover, as recognized by the lower court, there "is no dispute that DOC did not provide notice of the increased deduction." *Washington*, 2021 WL 6139806 at *3.

*2. Effect of Notice and Opportunity to be Heard Prior to the First (Pre-Amendment) Act 84 Deduction*

In both the instant case and in *Beavers*, there was no question that prior to the rate change the DOC had satisfied *Montañez*'s notice requirements in accordance with *Bundy*. However, the *Beavers* court indicated that there was no reason for the DOC to provide additional notice for such inmates due to the rate change because "an increase in the rate of the deduction from 20% to 25% did not change the total amount of … court-ordered fines and costs or change the account from which the deductions are made[,]" further noting that "the notice prescribed in *Bundy*" did not "include notice of a change in Act 84." *Beavers*, 2021 WL 5832128, at *4. Likewise, the lower court determined that the DOC was not obligated to provide additional notice beyond what was already provided before the first, pre-amendment Act 84 deduction occurred. *Washington*, 2021 WL 6139806, at *4.

This rationale is a misapplication of our precedent. While it is true that *Bundy* did not specifically prescribe notice of any subsequent changes to Act 84, only the most superficial reading of that decision could rationalize that an increase to the rate of Act 84 deductions would not require notice. *Bundy* required notice of "the total amount of [an inmate's] financial liability as reflected in his sentencing order, **as well as the Department's policy concerning the rate at which funds will be deducted from his account** and which funds are subject to deduction[.]" *Bundy*, 184 A.3d at 558

(emphasis added).  Plainly, *Bundy* did not only require notice of an inmate's total court-ordered financial liability, but also notice of the DOC's policy regarding the rate at which funds would be deducted.[45]  A change in the deduction rate strikes at the heart of *Montañez*'s notice requirements since the rate of deduction establishes the extent of the deprivation of property.  The rate of the deduction was therefore an essential element of *Bundy*'s notice requirements as well.  Thus, *Beavers* incorrectly determined that a change to the rate of Act 84 deductions did not implicate the procedural due process concerns at issue in *Bundy*.

*3. Relevancy of the Availability of a Remedy Impacting the Rate of the Deduction from the Inmate Account*

Following its prior decision in *Beavers*, the Commonwealth Court determined that no additional process was necessary because the text of Act 84 no longer provides the DOC with full discretion to set the rate of Act 84 deductions.  *Washington*, 2021 WL 6139806, *4 ("Critically, as recognized in *Beavers*, the statutory language materially differs from that in effect when *Bundy* and *Johnson* were decided" such that the "current statute does not afford DOC discretion over setting the amount and effectuating the deduction. As a consequence, DOC does not have the authority to exercise its discretion reasonably to discern whether the amount it deducts requires additional due process through an administrative process."); *accord Beavers*, 2021 WL 5832128, at *4 (stating "because the statute requires the Department to deduct a minimum of 25%, it

---

[45] Notably, *Bundy* addressed the prior version of Act 84, which had no prescribed deduction rate of any sort.  Thus, the essence of *Bundy*'s notice requirement was communication **of the DOC's policy implementing Act 84**, not the terms of the act itself.  It was the DOC's policy, therefore, and not the enabling statute, that is the impetus for the procedural due process rights at issue.

could not order a lesser deduction percentage even if it gave *Beavers* the hearing he seeks").

The Commonwealth Court misapprehends our precedent, conflating a substantive claim regarding the deprivation of an inmate's property with the related but distinct procedural due process claim associated with that taking. The right to procedural due process is absolute. *Piphus*, 435 U.S. at 266. It "does not depend upon the merits of a claimant's substantive assertions, and because of the importance to organized society that procedural due process be observed, … the denial of procedural due process should be actionable for nominal damages without proof of actual injury." *Id.* Applying this core principle of procedural due process to Act 84 deductions, this Court made clear in *Bundy* that "[e]ven apart from any concrete harm, if a procedural due process violation is demonstrated, nominal damages may be warranted[,]" noting that Bundy had also requested "declaratory and injunctive relief." *Bundy*, 184 A.3d at 559 (citing *Piphus*). Thus, even if Washington had no basis to seek substantive relief from the Act 84 rate increase due to the DOC's inability to deviate below the 25% minimum set by the 2019 amendment, he was still entitled to pre-deprivation notice and an opportunity to be heard.[46]

Nevertheless, the Commonwealth Court's rationale that the DOC lacked any discretion in setting the deduction is not supported by the facts. The text of the 2019

_____

[46] The Dissent simply ignores this distinction, myopically focusing on its belief that no substantive remedy is available. Dissenting Op. at 12 (stating "the majority is knowingly forcing DOC to provide Washington with an administrative remedy that is no remedy at all and encouraging Washington, and other inmates in his situation, to exhaust an administrative remedy that is essentially meaningless"). There is nothing meaningless about vindicating the constitutional right to procedural due process, nor should this Court discourage litigants from preserving that right even if no pot of gold exists at the end of the rainbow. The right to procedural due process protects the path, not the destination.

amendment permits the DOC to exercise at least some discretion, as the legislature did not mandate a 25% deduction rate across the board, it set a **minimum** deduction rate of 25%. 42 Pa.C.S. § 9728(b)(5)(i). Consequently, the DOC is clearly afforded discretion under Act 84 to deviate upwards from the 25% minimum rate as the DOC can apply a higher rate on a case-by-case basis. Logically, therefore, a decision by the DOC to apply the minimum rate of 25% is itself discretionary, even if the 2019 amendment set an absolute floor.

Moreover, the DOC does not treat the amendment to Act 84 as establishing an absolute floor for deductions from an inmate's account. By the terms of the Current DOC Policy issued after the 2019 amendment, the Department retained discretion to refrain from making Act 84 deductions from inmate accounts at all if their balances do not exceed ten dollars, a consistent policy since we first noted its existence in *Buck*. *Buck*, 834 A.2d at 700 n.7. Needless to say, a zero-percent deduction rate is a downward departure from the 25% rate and that departure is based upon an individualized assessment of an inmate's financial circumstances. Thus, the DOC's application of Act 84 through the Current DOC Policy demonstrates that it operates with discretion to depart downward from the 25% minimum deduction rate.

For any of the above reasons, we conclude that the Commonwealth Court erred in determining that no remedies were available based on Washington's procedural due process claim.

*4. Relevancy of the Absence of a Claim that Errors Occurred in the Deductions from the Inmate Account*

As noted by the Commonwealth Court, Washington's claims were substantially the same as those presented in *Beavers*. The Commonwealth Court in *Beavers* stated

that "the purpose of the pre-deduction hearing is to prevent erroneous deductions, *Bundy*[,] 184 A.3d at 558, and Beavers has not alleged that there were any errors that a hearing might correct." *Beavers*, 2021 WL 5832128, at *4. The court erred by presuming that the absence of a concrete remedy at the end of the process that is due is an excuse for denying the right to process itself.[47] "In procedural due process claims, the deprivation by state action of a constitutionally protected interest in 'life, liberty, or property' is not in itself unconstitutional; what is unconstitutional is the deprivation of such an interest without due process of law." *Zinermon v. Burch*, 494 U.S. 113, 125 (1990). Moreover, as this Court made clear in *Bundy*, the controlling inquiry in procedural due process claims is not whether some form of concrete relief will manifest at the end of the process that the Constitution requires; rather, "the 'controlling inquiry' in this regard is 'whether the state is in a position to provide for pre-deprivation process.'" *Bundy*, 184 A.3d at 557 (quoting *Hudson*, 468 U.S. at 534).

That "controlling" inquiry is governed by the *Mathews* Test, as informed by *Montañez*, *Bundy*, and *Johnson*. *Beavers* (and by extension the lower court in this matter due to its reliance on *Beavers*) did not apply the *Mathews* Test,[48] and instead focused solely on the potential for a remedy for deprivation of property, rather than on the DOC's obligation to provide adequate procedural due process in light of a substantial change to the DOC's Act 84 policy. In rare circumstances such as those

---

[47] Or, as the dissenting opinion in *Beavers* aptly observed, "this sidesteps the injury asserted" because the "issue . . . is the deprivation of due process, the provision of which would allow for the potential development of an argument regarding such errors. Whether there were any statutory errors in the amount of the deductions or the source of the funds are questions for a different body at a different time." *Beavers*, 2021 WL 5832128 at *8 (McCullough, J., dissenting).

[48] Indeed, the *Beavers* Majority did not even cite to *Mathews*.

observed in *Tillman* and *Reynolds*, i.e., when pre-deprivation process is not feasible, or it undermines legitimate institutional concerns, or it involves a truly routine matter of accounting, then post-deprivation process may be substituted for pre-deprivation process.

However, neither *Tillman* nor *Reynolds* is implicated here. The Commonwealth Court did not hold, and the DOC has never argued, that it is not feasible to provide inmates with *Bundy*-like pre-deprivation process prior to raising Act 84 deduction rates, nor that such process would conflict with the DOC's ability to safely and efficiently manage its prisons. And, unlike *Tillman*, where the routine calculation was a specific, daily charge assessed each day for housing costs, Act 84 deductions are far more complex.[49] Thus, the potential for errors is not negligible, much less zero.

Thus, the Commonwealth Court's focus on an ostensibly low potential for errors was misguided and largely informed by its misapplication of our precedent.

*5. Legislative Act Doctrine*

Although it was not a part of the lower court's rationale for granting the DOC's preliminary objections, the DOC argues that Washington was not entitled to any process at all under the Legislative Act Doctrine, which holds that the requirements of procedural due process do not extend to legislative acts because the "legislative process provides

---

[49] For instance, Act 84 applies a deduction rate to incoming deposits, which will vary in both magnitude and frequency for each individual inmate. Furthermore, the DOC has statutory discretion to apply different rates to different inmates, and it exercises discretion under the Current DOC Policy to exempt some individuals based on low balances. Moreover, inmates who have paid off their court-ordered obligations will no longer be subject to Act 84 deductions. Finally, the DOC must remain in constant communication with the clerk of courts in the event that changes to the total court-ordered obligations are made due to litigation or payments made outside of Act 84.

all the due process" that is required.  DOC's Brief at 13-14.[50]  The Legislative Act

Doctrine stems from the United States Supreme Court decision *Bi-Metallic*, which must

be understood in contrast to the High Court's decision a few years earlier in *Londoner*.

As the Eleventh Circuit carefully explained in *75 Acres, LLC v. Miami-Dade County*, 338

F.3d 1288 (11th Cir. 2003),

> in a pair of cases addressing taxation in Denver, Colorado,
> the Supreme Court first crystallized the important distinction
> in procedural due process cases between government
> conduct that is primarily legislative and conduct that is
> primarily adjudicative.  In the first case, *Londoner*[,] the Court
> was called upon to examine whether the Denver city council,
> acting as a board of equalization, violated due process when
> it failed to provide a group of landowners with a hearing
> before assessing a tax for the cost of paving a street that

---

[50] Washington asserts the DOC waived this theory because it was not adequately developed below.  Washington's Reply Brief at 4-5.  The DOC did not assert the Legislative Act Doctrine explicitly in its September 31, 2020 preliminary objections; however, the general theory that the DOC lacked discretion to deviate from a legislative mandate was raised in support of its preliminary objections.  *See* Prelim. Obj. at 2 ¶ 15 ("The amendment requires the [DOC] to make monetary deductions of **at least 25%**.") (emphasis in original).  The DOC first advanced the Legislative Act Doctrine before the Commonwealth Court in the summary of argument section of its brief in support of preliminary objections filed on November 12, 2020.  Brief in Support of Preliminary Objections at 6 ("Finally, the [DOC] is bound to the statute and is no longer making a discretionary administrative decision regarding the percentage deduction.  'It is well settled that procedural due process concerns are implicated only by adjudications, not by state actions that are legislative in character.' *Small v. Horn*, 722 A.2d 664, 671 (Pa. 1988).").  In the argument section of the brief in support of preliminary objections, the DOC cited *Sierra Lake Reserve v. City of Rocklin*, 938 F.2d 951 (9th Cir. 1991), *opinion vacated on other grounds*, 987 F.2d 662 (9th Cir. 1993).  In *Sierra Lake*, the Ninth Circuit dismissed a procedural due process challenge to a City's rent control ordinance based on the Legislative Act Doctrine, reasoning that a legislative action can be challenged by a plaintiff "on substantive grounds . . . if the action amounts to a taking," but that a plaintiff "may not raise a procedural due process challenge to such action" when the action "is legislative in nature" because "due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law." *Sierra Lake*, 938 F.2d at 957.  We conclude the DOC sufficiently raised the issue before the lower court in this case and, accordingly, we address the issue although, for the reasons discussed below, we do not reach the merits of it.

abutted their property. The Court concluded that due process was violated in such a circumstance because a subordinate body, the city council, had been given "the duty of determining whether, in what amount, and upon whom [the tax] shall be levied, and of making its assessment and apportionment." [*Londoner*], 210 U.S. at 385–86[.]

Just eight years later, however, in *Bi-Metallic*[,], the Court was asked to examine an order of the State Board of Equalization which required the local taxing officer in Denver to increase by 40 percent the assessed value of all taxable property in the city. In concluding that the order did not violate due process despite the Board of Equalization's failure to provide individual taxpayers with an opportunity to be heard, the *Bi-Metallic* Court drew a distinction between the adjudicative act of the city council in Londoner and the legislative act of the Tax Commission in *Bi-Metallic*. The public improvement assessment at issue in *Londoner* concerned "[a] relatively small number of persons," they were "exceptionally affected," and "in each case upon individual grounds." *Bi-Metallic*, 239 U.S. at 446[.] By contrast, the "across-the-board" valuation increase in *Bi-Metallic* applied equally to all landowners in Denver, prompting the Court to observe:

> Where a rule of conduct applies to more than a few people, it is impracticable that everyone should have a direct voice in its adoption. The Constitution does not require all public acts to be done in town meeting or an assembly of the whole. General statutes within the state power are passed that affect the person or property of individuals, sometimes to the point of ruin, without giving them a chance to be heard. Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule.

*Id.* at 445[.]

*75 Acres*, 338 F.3d at 1293.[51]  *Accord Small v. Horn*, 722 A.2d 664, 671 (Pa. 1998) ("It is well settled that procedural due process concerns are implicated only by adjudications, not by state actions that are legislative in character.").

Pursuant to *Bi-Metallic*, the DOC maintains that that Washington's procedural due process challenge implicates the Legislative Act Doctrine because of the mandatory minimum 25% deduction rate required by Act 84, distinguishing this case from the "the concerns recognized by the Third Circuit in *Montañez* and this Court in *Bundy* and its progeny[,]" where no legislation mandated a specific deduction rate from inmate accounts.  DOC's Brief at 16.  We disagree that the Legislative Act Doctrine is implicated in this case.

The DOC cannot rely on the Legislative Act Doctrine to disregard *Bundy*'s procedural due process mandate based on the 2019 amendment to Act 84 when the DOC does not itself treat that amendment as a general statute that establishes an absolute minimum 25% deduction rate that applies to all inmates subject to Act 84.  As established above, the Current DOC Policy applies differently to different inmates based

---

[51] In *75 Acres*, the Eleventh Circuit considered whether a regulation in the Miami-Dade County Code was primarily legislative or adjudicative.  At-issue was a code provision that required the county manager to impose a building moratorium on a parcel when "the propriety of that property's zoning classification has been called into question by criminal allegations of bribery or fraud."  *75 Acres*, 338 F.3d at 1296.  *75 Acres* concluded that it was a legislative act at issue, because there was no dispute that the code provision was enacted by a legislative body by a legislative process.  Furthermore, the code was not limited in "application solely to 75 Acres' property.  Rather, any property owner in Miami–Dade County would be subjected to a moratorium . . . if his or her property were implicated in zoning fraud."  *Id.* at 1297.  And although the moratorium was triggered by the "State Attorney's factual determinations and discretionary act" that gave rise to the filing of a criminal complaint, *75 Acres* concluded that the "State Attorney's act of filing a criminal information is best characterized as a legislatively-defined condition precedent that does not transform the imposition of a moratorium . . . from a legislative act to an adjudicative act."  *Id.* at 1298.

on their individual financial circumstances and court-ordered debt obligations. The DOC does not simply apply a 25% deduction rate across the board, as it maintains an exception to the prescribed rate for any inmate account holding ten dollars or less.[52] Thus, the Legislative Act Doctrine is inapplicable in the circumstances of this case. [53]

---

[52] *See* Current DOC Policy §§ 2(B)(4)(a), 3(A)(2)(e)(1), 3(A)(2)(e)(2), 3(C)(2)(b)(1), and 3(F)(1-6).

[53] The Dissent contends that the "DOC's promulgation and implementation of its Act 84 policy constitutes a legislative action, not an adjudicatory action, and, therefore, Washington is not entitled to any process in addition to that which he already received prior to DOC's initial Act 84 deduction from his inmate account[,]" relying on *Small* (examining DOC policy banning inmates' possession of street clothing due to its use in an escape) and *Sutton v. Bickell*, 220 A.3d 1027 (Pa. 2019) (examining DOC policy banning inmates' possession of Timberland-style boots after their use in a murder of a prison guard). Dissenting Op. at 7. In both cases this Court applied the Legislative Act Doctrine (with scant analysis) to pro se procedural due process challenges to new DOC policies that were prompted by security concerns. Neither case involved a policy implementing a statutory mandate, both involved the application of alternative grounds for finding no due process violation, and the DOC does not discuss either case in its argument.

The Dissent would apply the Legislative Act Doctrine because the Current DOC Policy "applies equally to all inmates," and because the DOC "has no discretion in its application" of the policy "to those inmates[.]" Dissenting Op. at 7. Neither proposition is true. As discussed repeatedly above, the Current DOC Policy plainly does not apply "equally" to "all inmates," nor does the DOC lack discretion in its application. The policy applies differently to inmates based on whether they have any Act 84 obligations at all, and when they do, individualized assessments are made by the DOC to determine the amount of money contained in individual inmate accounts and the amounts of qualifying deposits in order to determine the amount of the periodic Act 84 deduction and the potential applicability of the ten-dollar exception. Inmates who do pay at the 25% rate are not "equally" affected either, *see supra* footnote 49. As such, the Current DOC policy is distinguishable from the *Tillman* policy which assessed a truly equal daily rate of ten dollars on each inmate without exception. Furthermore, the DOC clearly exercises discretion by applying the ten-dollar exception whether Act 84 permits it or not, a question the Dissent admits is not before this Court today. Dissenting Op. at 7 n.4. Notably, neither party disputes the DOC's authority to apply the ten-dollar exception, a policy the legislature was aware of as it predated the amendment to Act 84.

(continued…)

Moreover, a reading of *Bi-Metallic* demonstrates that the Legislative Act Doctrine was never intended to apply in these circumstances. The *Bi-Metallic* Court expressly justified bypassing individual procedural due process rights only where two conditions were present. The first condition exists when the burden of litigating individual procedural due process claims, involving universal or near-universal government policies, would effectively seize the machinery of government. *See Bi-Metallic*, 239 U.S. at 445 (holding that there "must be a limit to individual argument … if government is to go on" where the government policy affects the property of persons who all "stand alike" or where "are all equally concerned"). The second condition was the presence of a backstop political remedy to address the due process concerns stemming from the government taking. *Id.* ("Their rights are protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule."). Neither condition is present here.

As to the first condition, the Current DOC Policy is not a government policy of universal or near-universal application. Although issued by a statewide agency, the Current DOC Policy only affects a tiny subset of the population who are incarcerated, subject to Act 84 obligations, and who have more than ten dollars in their inmate accounts. The Dissent vacillates between describing the Current DOC Policy as one that "applies equally to all inmates," *id.* at 7, and one that affects "all inmates under DOC's supervision who have outstanding court-ordered financial obligations[,]" *id.* at 8. Only the latter description is accurate. The classes defined by the Dissent, although irreconcilable, are nonetheless profoundly dissimilar to the near-universal class of individuals targeted by the taxing regulation in *Bi-Metallic* that affected all taxable property in Denver. But even if the class of affected persons here is sufficiently broad for purposes of the Legislative Act Doctrine, there has been no claim by the DOC that providing notice of the 5% rate increase to affected inmates, and providing them with the opportunity to engage in an extant grievance process, would in any way inhibit the DOC's operations, much less inhibit the Commonwealth's ability to govern more generally. The DOC has not made any such claim, most likely because the infrastructure is already in place to provide both notice and an opportunity to be heard under the undisputed facts of this case, as inmates are already periodically notified of their Act 84 obligations, and a grievance process already exists to address prisoner concerns. Thus, the Dissent's bald declaration that it would be "a waste of [the] DOC's resources" to adhere to the bare minimum requirements of procedural due process is far more a reflection of its illusory and unsubstantiated policy concerns than it is a statement about the applicability of the Legislative Act Doctrine as a matter of law.

As to the second condition, we can say for certain that there is no equivalent political remedy to that contemplated in *Bi-Metallic*. DOC inmates cannot throw the policy makers out of office as a substitute for the curtailing of their procedural due process rights at an individual level. Most if not all inmates governed by the Current DOC Policy (continued…)

*6. Mathews Test*

*Mathews* provides for a three-part inquiry, starting from a presumption that pre-deprivation notice and an opportunity to be heard is required.[54]  Under this test, we consider: 1) the private interest affected; 2) the risk of an erroneous deprivation and the value of additional or substitute safeguards; and 3) the state's interest, including the burdens the additional or substitute procedural requirements would impose on the state. *Bundy*, 184 A.3d at 557  (citing *Mathews*, 424 U.S. at 335).  This Court applied the *Mathews* test in *Bundy* with regard to the DOC's policy implementing Act 84, concluding that "the Department **must**, **prior to the first deduction**: (a) inform the inmate of the total amount of his financial liability as reflected in his sentencing order, **as well as the Department's policy concerning the rate at which funds will be deducted from his account** and which funds are subject to deduction; and (b) give the inmate a reasonable opportunity to object to the application of the Department's policy to his account." *Bundy*, 184 A.3d at 558-59.  The circumstances considered in the application of the *Mathews* Test here are no different from those considered in *Bundy*.  Thus, there is no reason to deviate from *Bundy*'s mandate here.

Accordingly, for all the reasons stated above, we agree with Washington and hold that an increase to the Act 84 deduction rate triggers *Bundy*'s procedural due

---

(…continued)
have been disenfranchised formally (in the case of felons) and/or practically (in the case of inmates serving time in state prison exclusively for misdemeanor offenses).  The DOC spins the ostensible legality of this mass disenfranchisement as a workaround rather than as a fatal flaw to its invocation of the Legislative Act Doctrine.  However, the legality of the disenfranchisement cannot cure the absence of political remedy.

[54] The Supreme Court clearly explained in *Zinermon* that in applying the *Mathews* Test, the general rule is that pre-deprivation process is required before a deprivation of property occurs, and that it is only in exceptional circumstances when a post-deprivation remedy is appropriate.  *See Zinermon*, 494 U.S. at 127-28.

process requirements, and that the Commonwealth Court erred when it sustained the DOC's preliminary objections by concluding otherwise.

## IV. Conclusion

Fairness, in the context of procedural due process, means having the right to notice and the opportunity to be heard **before** property is taken by the government. Only in exceptional circumstances do these principles of procedural due process permit the substitution of a post-deprivation process for the default requirement. There was nothing exceptional with respect to the amendment to Act 84 to justify the DOC's failure to afford pre-deprivation notice and an opportunity to be heard in the circumstances of this case. And while fairness in the process does not guarantee substantive relief for the taking, the unavailability of substantive relief at the end of that process is not an exception to the default rule. To deny the right to procedural due process based on the assumption that relief is unavailable is to deny the right to process itself, by subsuming it within the right to property. These rights are distinct and call for different remedies when they are transgressed by government action.

In sustaining the DOC's preliminary objections, the Commonwealth Court condoned the DOC's deprivation of Washington's right to pre-deprivation process when it increased the rate of his Act 84 deductions. Washington may not ultimately be entitled to a return of the additional funds under any theory of relief, but he has right to make his case before the taking occurs. He requested both a hearing and injunctive relief, both of which were in the Commonwealth Court's power to provide. Accordingly, we conclude the Commonwealth Court erred in granting preliminary objections because it is not certain that no relief is available for the violation of Washington's right to

procedural due process.[55]  We therefore reverse the order sustaining preliminary objections and remand for further proceedings consistent with this opinion.

Chief Justice Todd and Justice Wecht join the opinion.  Justice Dougherty joins the opinion except for Section III.B.1.b and the last paragraph of footnote 53.

Justice Dougherty files a concurring opinion.

Justice Brobson files a dissenting opinion in which Justice Mundy joins.

---

[55] In *Bundy*, we recognized the availability of three remedies for a violation of procedural due process in the circumstances presented here: 1) a post-deprivation hearing; 2) an injunction prohibiting future account deductions pending the outcome of the post-deprivation hearing; and 3) the award of nominal damages.  *Bundy*, 184 A.3d at 559.